

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| VICTORY ENERGY CORPORATION, SMARTGAS, L.L.C, and HCP INVESTMENTS, L.L.C., Appellants, | § | No. 08-12-00248-CV |
| | § | Appeal from the |
| v. | § | 112th Judicial District Court |
| | § | of Crockett County, Texas |
| OZ GAS CORPORATION, Appellee. | § | (TC# 08-04-07047-CV) |
| | § | |

**O P I N I O N**

Appellants – three business associations that were purportedly assigned oil and gas leases on certain land in Crockett County – appeal the trial court's partial grant of summary judgment and merits verdict naming Appellee Oz Gas Corporation as the true leaseholder of the disputed land and assessing damages against Appellants for bad faith trespass. We affirm.

## BACKGROUND

### *Factual History*

### The Adams-Baggett Ranch Leases

In 1974, Emma Lou Phillips Adams, Camille Adams Jones, and Jane Adams Garlitz (collectively, "the Adams Family") executed five oil and gas leases ("the 1974 Leases") conveying mineral interests in certain tracts of land on the Adams-Baggett Ranch near Ozona to

Chesapeake Bay Gas Gathering Company, an entity owned by Jane's husband, C. Gary Garlitz. One such lease ("the Third Lease") covered a 320-acre parcel of land known as the Eastern Half of Section 155 ("E/2 of Sec. 155" or "the Third Lease Estate").[1] The lease agreement permitted drilling to a depth of 5,500 feet and set out a two-year primary term, with the lease continuing indefinitely "so long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them is produced from said land." Under the lease, either party was free to assign their lease rights at will, provided that in the event that the lessee assigns part of the lease to a third party that subsequently defaults on the agreement, "such default shall not affect this lease insofar as it covers a part of said lands upon which lessee or any assignee thereof shall make payment of said rentals." Neither party in their briefs complains that Chesapeake in any way failed to drill wells and place those wells into production within the primary term as required by the Third Lease.

Relevant to this appeal is a 160-acre tract of land located on the southern half of the Third Lease Estate referred to by the parties as the Southeast Quarter of Section 155 ("SE/4 of Sec. 155" or "the Tract").[2] Texas Railroad Commission records show that in February 1975, a well known as Adams 1-1155—located on the Tract within the Third Lease Estate—began producing in paying quantities. At the time the parties executed the Third Lease, the Railroad Commission's special field rules for oil and gas developments on the Adams-Baggett Ranch provided that each proration unit[3] surrounding a single oil well was set at 320 acres. *See*

---

[1] The lease that conveyed the Tract included the entire eastern half of Section 155. The disposition of the rest of the land subject to this particular lease is not strictly relevant to this appeal.

[2] The formal name of the tract of land is the SE/4 of Section 155, Abstract 1652, Certificate 1758, Block O, GH&SA Ry.Co. Survey, Crockett County, Texas.

[3] A proration unit is a geographic area administratively set by the Texas Railroad Commission after an oil well has been drilled that demarcates certain minimum acreage around the well "for the purpose of assigning allowables and allocating allowable production to the well" so that wells within a particular oil field may drain efficiently. 16 TEX.ADMIN.CODE § 3.38 (2004)(Tex.R.R.Comm'n); *see also Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 634 (Tex.App.--Austin 2000, pet. denied). "Production allowables refer to the maximum amount of hydrocarbons a well

Tex.R.R.Comm'n, *In re: Adams-Baggett Ranch (Canyon Sand) Field, Crockett County, Texas*, Docket No. 7C-60,233 (Sept. 8, 1970)(interim order). Later, in 1981, a second well known as Adams-14—located on the northern half of the Third Lease Estate ("the NE/4 of Sec. 155") outside the Tract—also began producing in paying quantities.[4]

The Commission later modified the Adams-Baggett field rules on August 30, 1982, by reducing the size of individual proration units around wells to 160 acres. *See* Tex.R.R.Comm'n, *Final Order Amending Rule 2 of the Field Rules Adopted in Special Order No. 7-60,233 Issued Effective November 1, 1970, As Amended for the Adams-Baggett Ranch (Canyon Sand) Field, Crockett County, Texas*, Docket No. 70-78,467 (Oil & Gas Div. Aug. 30, 1982). The modifications also allowed a well operator, at its discretion, to further subdivide a 160-acre proration unit into two 80-acre "fractional" proration units. *Id*. Apparently pursuant to the special field rules, the Tract was sub-divided into two jigsaw-shaped, equal-sized eighty-acre units, with a well drilled on each unit respectively. Argee Oil Company operated an oil well ("Argee #1-155" or "the Argee Well") on the eastern eighty acres of the Tract ("the East Unit") at the behest of Chesapeake. Crockett Gas, Ltd. – a company of which Gary Garlitz was the managing partner – operated another well ("Crockett 1-155," "Adams 155-1," or "the Crockett Well") on the western eighty acres of the Tract ("the West Unit"). Both Crockett and Argee Oil filed forms with the Railroad Commission informing it of their respective claimed acreage within the Tract.

The Crockett Well on the West Unit was not seen as very productive, and from January 31, 1998, to September 2000, the well was shut-in with a bridge plug to prevent further

---

may recover as prescribed by the applicable field rules." *Id*.

[4] It is unclear from the record how two wells could permissibly be located on the Third Lease Estate, since the size of the E/2 of Sec. 155 was 320 acres and, under this rule, each well had to have at least 320 acres assigned to it for proration purpose.

production. As of April 28, 2011, the Argee 1-155 well has continued to produce hydrocarbons, save for a brief cessation of production in February 1992.

**Mortgage of Chesapeake Leasing Interests and Default on Deed of Trust**

In July 1986, almost twelve years after it signed the Third Lease, Chesapeake, acting through Garlitz, executed a $2.5 million promissory note to Abbott Laboratories that was personally guaranteed by Garlitz and secured by a deed of trust ("the Deed of Trust") on portions of the original 1974 Leases as listed in an attached exhibit, including Chesapeake's interest in the the Tract (i.e. the SE/4 of Sec. 155, the southern half of the Third Lease Estate). In essence, Chesapeake mortgaged the Tract and other quarter-unit portions of the 1974 Leases to Abbott, agreeing to repay the advance in kind with deliveries of natural gas. As part of the transaction, Abbott had attorney David Childress prepare a title opinion ("the 1986 Childress Title Opinion"), which confirmed Chesapeake's interests in the Tract. In their briefs before this Court, neither party disputes that prior to the foreclosure sale, the original and entire leasehold estate created by the Third Lease was held open and in existence by production in paying quantities from the two wells located on the E/2 of Sec. 155, i.e. the Argee Well and the Adams-14 well located outside the Tract but still within the Third Lease Estate.[5]

Chesapeake later defaulted on the agreement, although the specifics of how or when are unclear. In any event, Abbott assigned the promissory note and deed of trust to Detroit-Texas Gas Gathering Company. A flurry of litigation ensued against both Chesapeake and Garlitz in his personal capacity before Chesapeake filed for bankruptcy. Oz Gas Company later assumed

5 Texas Railroad Commission records indicate that both the Argee Well and the Adams-14 well have briefly ceased production, although not at the same time. The Adams-14 well stopped producing for a brief period in October and November 1990, while the Argee Well briefly ceased production in February 1992. Since both wells were part of the Third Lease Estate, since at least one well on the Third Lease Estate was always in production, and since neither party contends before this Court that the Third Lease is invalid, we assume that the production stoppages did not terminate the Third Lease and it continues to be valid.

Detroit-Texas' interest in the leasehold estates while foreclosure had been stayed by the bankruptcy proceedings.

**The Bankruptcy Settlement**

On November 1, 1997, the bankruptcy trustee abandoned the Chesapeake properties subject to the Deed of Trust, placing them outside the aegis of the bankruptcy stay. Oz then began foreclosing on the Deed of Trust Property. Before Oz could complete foreclosure, however, Oz, Chesapeake, Garlitz, and certain members of the Adams Family then entered into a Settlement Agreement relating to the disposition of the rest of the mortgaged leases. As part of the settlement, the parties agreed, *inter alia*, to relinquish any claims they had to leases upon which Oz Gas had already foreclosed. The parties also agreed that Oz Gas would foreclose on the leaseholds listed in an appended Exhibit B in the future, including the Argee Well located on the "W/2 SE/4 § 155."[6] The Settlement Agreement did not explicitly address the existence or disposition of the shut-in Crockett Well on the West Unit. It did, however, explicitly exempt several other discrete tracts of land from foreclosure. Settlement Agreement Exhibits A and B both contained the following disclaimer:

> It is the intent of this Agreement to provide for all Argee Wells and all other wells and acreage covered by the Deed of Trust other than the wells located in Sec. 127, 153 and E/2 NE/4 of Sec. 115. Therefore, if it should be determined that the above descriptions do not cover all such wells, the parties agree to execute such other documents are deemed [sic] sufficient by counsel for such parties to effectuate the above intent.

As part of the Settlement Agreement, Oz Gas required Jane Garlitz and her mother to sign a revival and ratification ("the Revivor") of all the original 1974 Leases in Oz Gas' name .[7] The Revivor Agreement explicitly mentions SE/4 of Section 155 and states that the lessee will

[6] Assuming "W/2" means West Half, we note that Argee 1-155 is actually located on the East Half of the SE/4 of Sec. 155.

[7] Camile Adams Jones refused to sign the Revivor Agreement.

place "each well currently located on the Lands" listed into production within six months, "failing in which, upon demand of Jane Garlitz and Emma Lou Adams, Lessee agrees to either release this Lease or assign all of its leasehold interest . . . and all personal property used in connection therewith" back to Jane Garlitz. The Revivor was recorded in the Crockett County Deed Records. The Settlement Agreement was unrecorded.

**Foreclosure of the Leases and the Substitute Trustee's Deed**

In February 1998, the substitute trustee foreclosed on the properties, issuing an Amended Substitute Trustee's Deed ("the Trustee's Deed") to Oz, who purchased the properties at foreclosure. The Trustee's Deed makes no mention of the Settlement Agreement that presumably governed the terms of the foreclosure sale. The Trustee's Deed purported to convey "[a]ll of the property more particularly described on Exhibit 'A' attached hereto and incorporated herein by reference for all purposes." A list containing a description of all foreclosed properties was appended to the Trustee's Deed as Exhibit A. The attached exhibit breaks up the description of the foreclosed lands into several "parcels" containing descriptions of quarter-sections of land, leases, and wells. The parcel at issue here is Parcel 3. We reprint the text from the Trustee's Deed Parcel 3 grant below verbatim:

PARCEL 3:

NW/4 of Section 166, Abstract No. 4770, J.T. Casbeer; Original Grantee;

SE/4 of Section 155, Abstract No. 1652, GH&SA Ry. Co. Survey;

SE/4 of Section 126, Abstract No. 5041, J.T. Casbeer, Original Grantee.

| Lessor | Lessee | Date | Recording Volume | Data Page |
|---|---|---|---|---|
| Emma Lou Phillips Adams, et al. | Chesapeake Bay Gas Gathering Co. | 10/23/74 | 288 | 162 |

| Wells | Working | Net Revenue |
|---|---|---|

| | Interest | Interest |
|---|---|---|
| Argee Oil Company #1-155 and #1-166 | 75% | .5791670 |
| Crockett Gas, Ltd. #2-166 | 100% | .7468200 |
| Chesapeake Bay (Crockett Gas) #2-126 | 100% | .7668496 |

Under Parcel 3, the Tract (i.e. the SE/4 of Section 155) is identified along with other quarter-sections of land, as well as Argee Well #1-155 on the East Unit, in which Chesapeake reportedly had a 75 percent interest at the time of conveyance. Once again, the Crockett Well on the West Unit is not explicitly mentioned in the document.

The following introductory proviso to Exhibit A ("the Introductory Proviso") precedes the listing of all parcel units:

> The following oil and gas leases are limited in area to the Railroad Commission of Texas proration units surrounding the oil and/or gas wells referenced below and are subject to depth restrictions and the other provisions of these leases [i.e. the 1974 Adams Leases].

**Garlitz Re-Enters West Unit Following Foreclosure**

In fall 1999, more than a year after the lease foreclosures, Garlitz re-entered the Tract's West Unit, removed the bridge plug to the Crockett Well located on the southern half of the Unit, and began laying pipeline to put the formerly defunct Crockett Well back into production. Garlitz maintained at trial that he did so because Oz Gas had failed to place the Crockett Well into production within the six month period required by the Revivor Agreement. However, Garlitz also acknowledged that neither his wife nor his mother-in-law had made any request, written or otherwise, to Oz pertaining to that well. Garlitz also admitted that he never informed the Texas Railroad Commission that he intended to put Crockett Well back into production. Oz

Gas continued to operate the Argee Well on the East Unit several hundred feet away for several years, allegedly unaware that Garlitz was attempting to produce hydrocarbons from the West Unit.

**Garlitz and Assignees Convey West Unit Interests to Appellants**

On November 1, 2007, Garlitz, claiming to be the agent for "Adams Fee Properties, Inc.," executed an oil and gas lease subject to a special warranty that purportedly conveyed a 100 percent interest in twenty acres of the West Unit to Universal Energy Resource, Inc. ("Universal"), owned by Jim Dial. Texas Secretary of State records indicate that Adams Fee Properties Inc. is the assumed name of Adams Ranch, Inc., an entity dissolved by the Texas Secretary of State in 2004 for non-payment of taxes. No evidence exists in the record to suggest that this entity was ever conveyed any interest in the property. In an affidavit, William Wade Garlitz, president of Adams Ranch, Inc., prior to its dissolution, explained that Gary Garlitz did not act as Adams Ranch's authorized agent during the purported sale of the lease, nor did Adams Ranch Inc., ever own or claim to own any of the leases at issue in this lawsuit. Gary Garlitz later claimed in an affidavit submitted to the trial court that he "forgot" Adams Ranch, Inc., had claimed "Adams Fee Properties" as an official assumed name with the Secretary of State, and maintained that he did not intend to act as an agent for Adams Ranch, Inc., or for his children.

Following the sale, Universal hired Remuda Operating Company ("Remuda") to drill two additional wells on the West Unit – Adams 155-2 and Adams 155-3.[8] Drilling on Adams 155-2 began on October 23, 2007, and finished November 12, 2007, with a completion date of December 15, 2007, filed with the Railroad Commission. Adams 155-3 drilling began November 16, 2007, and was completed on November 28, 2007, with Railroad Commission files showing a completion date of March 4, 2008.

[8] These wells are also referred to in discovery documents as Remuda 155-2 and Remuda 155-3.

Victory Energy Corporation ("Victory"), HCP Investments, L.L.C. ("HCP Investments" or "HCP"), and SmartGas, L.L.C. ("SmartGas") – the Appellants in the case at bar – all purchased their interests in these two wells either from Universal or directly from Garlitz. Universal conveyed 50 percent of its interest in Adams 155-2 to Victory on December 3, 2007, about two weeks prior to the completion date listed in Texas Railroad Commission records. Another assignment lists Universal as assigning the remaining 50 percent of its interest in Adams 155-2 to HCP Investments on June 7, 2007 – nearly five months before Universal received its initial "interest" from Adams Fee Properties. Garlitz conveyed 100 percent of the working interest in Adams 155-3 to SmartGas on December 6, 2007, after drilling had been completed but before the completion date listed in Texas Railroad Commission records.

**Appellants' Due Diligence**

Appellants HCP Investments and SmartGas are family-owned L.L.C.'s managed by John Callis on behalf of his father-in-law. Callis was employed by BP Financial and claimed that prior to these deals, he had never been personally involved in oil and gas transactions before. Callis testified at trial that he had participated in prior real estate transactions before, and that each time he had been involved in one of those transactions, he had always ensured title was good before purchase.

Callis further testified that Dial, the owner of Universal whom he met first, introduced him to Garlitz. Prior to the SmartGas Adams 155-3 deal, when Callis asked Garlitz about title issues, Garlitz assured Callis he owned the lease and showed Callis the 1986 Childress Title Opinion, which had been prepared prior to the execution of the Abbott Mortgage and the subsequent Oz Gas Settlement Agreement. That title opinion listed Chesapeake as the owner of the land, not Adams Fee Properties. That title opinion also did not reflect the pre- and post-

bankruptcy foreclosure of land subject to the Deed of Trust. Apart from that title opinion, Callis did not seek any other assurances on title before entering into the transaction with both of his companies and investing $6 million. Likewise, in an interrogatory, Victory also admits it had "reason to believe" that Universal had title based on the 1986 Childress opinion, and for this reason it did not conduct its own separate title search or commission and independent title opinion prior to purchase.

**Pre-Suit Payment of West Unit Well Royalties**

In an affidavit submitted by Tom Aylesworth, Remuda's president, for the first three production months, Remuda distributed 74 percent of the working interest in the two wells to Universal and 12.75 percent to Adams Fee Properties, Inc., "based upon representations made to Remuda" that those companies owned the interest in the wells. Universal received $137,897.13 for the first three months of production. Callis testified that HCP Investments received one payment from Jim Dial before Oz brought suit. Callis did not know whether the money he received from Dial came from the working interest on the West Unit wells, or from some other source. Victory and HCP both deny ever having received any payments at all.[9]

Remuda claims that later the three months' pay to Universal was placed into Remuda's Suspense Account pursuant to court order. A second court order placed that money, and any future monies from the wells, into the court's registry pending the outcome of litigation.

***Procedural History***

Oz filed a trespass to try title suit against Remuda, Universal, 1st Texas Natural Gas Company, and Millennium Midstream Partners, L.P., alleging that the defendants trespassed on Oz's oil and gas lease and requesting injunctive relief. The parties eventually came to an agreement to have Remuda continue operating the West Unit wells during the course of

[9] Victory sued Dial and others in Midland County in a parallel suit for fraud stemming from this transaction.

litigation, with funds from the working interest of the wells deposited into the court's registry.

The defendants moved for hybrid summary judgment. Oz later added SmartGas as a party, who joined in the defendant's hybrid motion for summary judgment. Oz cross-moved for partial summary judgment on the issue of title. The trial court initially denied all motions for summary judgment. Oz re-urged its summary judgment motion, and Victory intervened as a party prior to the trial court's reversal of its previous order and rendition of partial summary judgment in favor of Oz. In its summary order, the trial court found that Oz owned a leasehold interest in the entire 160 acres of the Tract—both East Unit and West Unit—by virtue of the Trustee's Deed. Damages were to be assessed at trial.

Following rendition of summary judgment, HCP was joined as a defendant. Oz re-urged its motion for summary judgment against Victory and HCP, seeking to extend the title judgment to include Victory and HCP as a "housekeeping" matter based on the two defendants' contention that the summary judgment order did not reach them. The trial court declined to rule on Oz's renewed motion for summary judgment against Victory and HCP, stating that it wanted to hear where Victory and HCP thought their interest came from at trial. After trial, the court found that Victory, HCP, SmartGas, and the other remaining defendants were all bad faith trespassers.

Victory, HCP, and SmartGas appealed.

## DISCUSSION

The critical issue in this case is whether by virtue of the Trustee's Deed, Oz possesses the leasehold to the entire Tract, or merely the East Unit. Appellants bring ten largely overlapping issues that ultimately advance two general arguments on appeal. First, Appellants contend that the trial court erred, both in its partial summary judgment against SmartGas and at trial against Victory and HCP, in determining that they trespassed on Oz's land, since Oz failed to establish

that it obtained rights to the Tract's West Unit from either the Trustee's Deed or the Revivor Agreement. Second, in the alternative, Appellants maintain that the trial court's assessment of joint and several liability for bad faith trespass damages was erroneous, given that (1) Oz failed to bring forth sufficient evidence that Appellants physically invaded the property, (2) all Appellants had an honest and reasonable belief as to the superiority of their title to the West Unit, and (3) the evidence failed to show that individual Appellants actually obtained royalty payments from wells they did not personally manage. We address these issues in turn.

## I.

## TITLE AND TRESPASS

In Issues One and Two, Appellant SmartGas challenges the trial court's partial grant of summary judgment in favor of Oz establishing that Oz had a 100 percent undivided interest in the Tract by virtue of both the Trustee's Deed and the Revivor Agreement. SmartGas argues that the Trustee's Deed only conveyed the East Unit of the Tract, and that the Revivor Agreement could not have granted any rights to the West Unit because the original 1974 Lease was still valid due to continuing production, rendering the Revivor Agreement a contingent top lease only. In part of Issue Three and entirety of Issue Six, the remaining Appellants contend that the evidence was legally and factually insufficient to establish Oz's title to the Tract in relation to them as well during trial on the merits. All Appellants dispute the trial court's legal conclusion—and the sufficiency underpinning the legal conclusion—that they committed a mineral trespass in the remainder of Issue Three and Issue Seven. We disagree with Appellants on all points.

Because these issues all hinge on resolution of title, we address them together. We first address trespass to try title before turning the mineral trespass analysis.

### ***Summary Judgment Standard of Review***

Appellant SmartGas challenges the trial court's grant of Oz's traditional motion for summary judgment and denial of SmartGas' hybrid cross-motion for summary judgment on the issue of lease ownership. A party moving for traditional summary judgment is entitled to receive it where the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c). "A no-evidence summary judgment motion under Rule 166a(i) is essentially a motion for a pretrial directed verdict; it requires the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). "When reviewing a no-evidence summary judgment, we review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* [Internal quotations marks omitted].

When a party moves for summary judgment on both no-evidence grounds, TEX.R.CIV.P. 166a(i), and traditional grounds, TEX.R.CIV.P. 166a(c), we first review the ruling under the more stringent no-evidence standard before analyzing proof under the traditional standard, if necessary. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). "When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary judgment evidence presented by both sides and determine all questions presented and render the judgment the trial court should have rendered." *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004).

### ***Legal and Factual Sufficiency Standard of Review***

Appellants Victory and HCP challenge the legal and factual sufficiency of the trial court's adverse verdict on the issue of lease ownership in relation to them. The standard of review for factual and legal sufficiency challenges remains the same whether a judge or a jury served as fact-finder. *Raman Chandler Properties, L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 390 (Tex.App.--Fort Worth 2005, pet. denied).

We sustain a legal sufficiency challenge when the trial court's decision is unsupportable as a matter of law because (1) there is "a complete absence of evidence of a vital fact," (2) "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact," (3) there is "no more than a mere scintilla" of evidence proving a vital fact; or (4) the evidence conclusively establishes the opposite proposition of a plaintiff's proffered vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We view evidence in the light most favorable to the ruling on a legal sufficiency challenge, indulging "every reasonable inference" in the trial court's favor. *El Paso Independent School Dist. v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). "Any evidence of probative force supporting a finding requires us to uphold" the trial court's ruling. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Where an outcome-determinative interpretation of evidence falls within the zone of reasonable disagreement, we are without jurisdiction to disturb the verdict or decision. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 758 (Tex.App.--Dallas 2008, no pet.).

In a factual sufficiency challenge, we review the entire record in a neutral light and set aside the trial court's ruling only where it rests on evidence so weak or the finding is so contrary to the great weight and preponderance of the evidence that it shocks the conscience or is manifestly unjust. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *El Paso Healthcare System, Ltd. v. Carmona*, 160 S.W.3d 267, 274 (Tex.App.--El Paso 2005, pet.

granted, judm't vacated w.r.m.). While the overlap between legal and factual sufficiency is substantial, a legally sufficient verdict may still be overturned as factually insufficient. *See In re Commitment of Myers*, 350 S.W.3d 122, 130 (Tex.App.--Beaumont 2011, pet. denied); *In re Estate of Russell*, 311 S.W.3d 528, 532 (Tex.App.--El Paso 2009, no pet.). Where an appellate court reverses a verdict or judgment on factual insufficiency grounds, it "must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Francis*, 46 S.W.3d at 242 [Internal quotation marks omitted].

### A. Establishing Title to the West Unit

In its first count in the live pleading against Appellants, Oz brought a trespass to try title claim. "The trespass-to-try-title statute was originally enacted in 1840 to provide a remedy for resolving title issues." *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004). "The statute is typically used to clear problems in chains of title or to recover possession of land unlawfully withheld from a rightful owner." *Id*. The plaintiff bears the burden of establishing superior title by a preponderance of the evidence in a trespass to try title suit. *Omohundro v. Jackson*, 36 S.W.3d 677, 680 (Tex.App.--El Paso 2001, no pet.). The plaintiff "must recover, if at all, on the strength of his own title and may not simply rely on the weakness of another party's claim." *Id*. The burden is met where the plaintiff shows: "(1) title emanating from the sovereignty of the soil; (2) a superior title in itself emanating from a common source; (3) title by adverse possession; or (4) title by prior possession coupled with proof that possession has not been abandoned." *Id*.

We note that although this is a trespass to try title action, neither side challenges the validity of the Trustee's Deed or argues that there is some defect in the chain of transfers.

Instead, both point to the same document as proof that each has rights to the West Unit. As such, we address only the construction of the deed issue presented before us. The dispositive question is whether Oz could establish, by a preponderance of the evidence, that the language in the Trustee's Deed granted it title to the Tract. We find that Oz met its burden.

***Principles of Deed Construction***

We review questions of deed construction *de novo*. *Boulanger ex rel. Westlum Trust v. Waste Mgmt. of Tex.*, Inc., 403 S.W.3d 1, 5 (Tex.App.--Houston [1st Dist.] 2012, pet. denied). "[I]ntent is the benchmark for judicial interpretation of deeds." *Id*. We discern the parties' intent through the language expressed in the deed in its entirety, "striving to harmonize all of its parts and give effect to all of its provisions." *Id*.

The threshold legal question in interpreting a deed is whether the instrument is ambiguous or not. *Id*. Ambiguity in the deed's language alters the scope of our evidentiary review. *Id*. "[I]f a written instrument remains reasonably susceptible to more than one meaning after the established rules of interpretation have been applied, then the instrument is ambiguous and extrinsic evidence is admissible to determine the true meaning of the instrument." *Gore Oil Co. v. Roosth*, 158 S.W.3d 596, 599 (Tex.App.--Eastland 2005, no pet.); *see also* Bruce M. Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction*, 24 TEX.TECH L.REV. 1, 12 (1993)(noting court decisions holding that parol evidence generally should not be admitted unless "pertinent rules of interpretation leave a real uncertainty as to which of two or more possible meanings represent the true intention of the parties"). Where a deed is clear and unambiguous, interpretation is a pure question of law, and we are limited to construing it within the four corners of the deed itself. *Boulanger*, 403 S.W.3d at 5. Even so, where the deed contains a "nucleus of description" referencing other existing

writings, "parol evidence may be introduced to explain the descriptive words in order to locate the land." *Gaut v. Daniel*, 293 S.W.3d 764, 767 (Tex.App.--San Antonio 2009, pet. denied). This integration approach is limited in scope. While "details which merely explain or clarify the essential terms appearing in the instrument may ordinarily be shown by parol," the deed's "skeleton" or "**essential elements may never be supplied by parol.**" *Id.* (quoting *Wilson v. Fisher*, 144 Tex. 53, 57, 188 S.W.2d 150, 152 (1945))[Emphasis in orig.].

***Analysis***

The threshold question here is whether the language of the Trustee's Deed is amenable to more than one reasonable interpretation. We find it is not.

To be sure, Oz and the Appellants offer conflicting interpretations of the deed as an unambiguous document, with each accusing the other's interpretation of rendering certain portions of the deed nugatory or improperly referencing parol evidence. Oz dismisses the Introductory Proviso as being "odd" and of no significance, and claims that Oz possesses the entire SE/4 of Sec. 155. Appellants maintain the same proviso radically limits the leasehold grants to the size of the proration unit around the wells listed therein and nothing else. While neither side's reading is completely correct, we believe Oz's reading of the deed is closer to the parties' intent.

Appellants cite *Sunwest Operating Co, L.L.C., v. Classic Oil & Gas, Inc.*, 143 Fed.Appx. 614, 618 (5th Cir. 2005)(unpublished)(interpreting Texas law), for the proposition that the Introductory Proviso in Exhibit A serves to limit the subsequent granting clause assignments only to the proration units around the wells listed therein. The granting clause language in *Sunwest* is not similar to the language in the case at bar. In *Sunwest*, certain portions of two existing oil and gas leases fell within a bounded geographic area known as the Velma Daniels

Gas Unit. The Fifth Circuit held that a specific granting clause in the original conveyance between parties explicitly limited the particular lease assignment within the clause to whatever interest the original conveyor had in the Velma Daniels Unit "and to acreage allocated to" the unit. *Sunwest Operating Co.,* 143 Fed.Appx. at 617. As such, lease acreage outside the Velma Daniels Unit was not included in the original conveyance. *Id.* The Court bolstered its reading of that granting clause by comparing it with other granting clauses in the conveyance that explicitly assigned both the oil well lease and the surrounding estates for other tracts. *Id.*

Here, the deed in question is less descriptive and far more spartan. The Parcel 3 granting clause contains only bare identifications of certain quarter-units of land and wells contained on those units without expounding, as in *Sunwest*, on how the land and the wells are related. *Compare id.* (granting clause explicitly identifies the particular unit in question, specifically limits the grant to any well acreage contained inside that unit, and mentions original leasehold estates for the explicit purpose of showing that only portions of those two estate are being conveyed). Also unlike in *Sunwest*, where limiting language was explicit and contained in the specific granting clause itself, here all of Exhibit A is subject to the general, vague Introductory Proviso stating, among other things, that oil and gas leases are limited to the size of the proration units surrounding the wells. Reading that general proviso as limiting the conveyances to only wells and their surrounding proration units renders the inclusion of the quarter-unit descriptions in the specific Parcel 3 granting clause essentially meaningless.

The radical effect of this reading becomes even clearer when the Introductory Proviso is read in relation to the other parcels listed in Exhibit A. For example, the parties agree that the seven quarter-units of land listed in Parcel 2 cover 1,120 acres. Yet Appellants maintain that by virtue of the Introductory Proviso, the Trustee's Deed only conveyed the 160 acres around the

Argee 1-117 well listed in Parcel 2, with the quarter-unit land descriptions included so as to make it easier on the reader to identify which well the parcel referenced. Since the location of a well can easily be identified by consulting with Railroad Commission records, Appellants' reading of the Trustee's Deed renders the inclusion of the seven quarter-unit descriptions virtually nugatory. Furthermore, other parcels in the Trustee's Deed indicate that if the parties had intended to convey only the proration units that surround the well, they certainly knew how to draft a granting clause reflecting that intent. As Oz points out, the description for Parcel 4 indicates that it conveys "80 acres out of the NW/4 of Section 155, A-1652, GH&SA Ry. Co. Survey (*being the proration unit assigned to the Argee Oil Company #2-155 well*) and being all of said NW/4 SAVE AND EXCEPT the 80 acre proration unit assigned to the Regency #1-155 well . . . ." [Emphasis added]. If the Introductory Proviso functioned as Appellants contend, the Parcel 4 language specifically identifying the conveyance as being the Argee #2-155 well's proration unit is nothing more than excess verbiage.

Appellants dismiss Oz's question regarding the insertion of quarter-unit land descriptions into Exhibit A as rhetorical, maintaining that language in other parcels of the Trustee's Deed are irrelevant to our interpretation because the Introductory Proviso cabins *all* the grants in *all* the parcels listed therein. However, we must construe all words in a deed as having meaning, if possible. *Boulanger*, 403 S.W.3d at 5. Furthermore, in construing a document such as a deed, we do not dissect individual clauses and read them in isolation from one another; rather, we read the document as one cohesive text. *Id.*

Instead, we believe that the more natural reading and the only tenable reading of the Trustee's Deed, the Introductory Proviso, and the Parcel 3 granting clause is that the quarter-unit descriptions in the Parcel 3 granting clause operate as conveyances, and that the parties intended

to convey the rights to those units of land, as well as any rights the grantor had in wells and their respective proration units explicitly listed on that land. To state it another way, Parcel 3 in Exhibit A of the Trustee's Deed deals with the disposition of the three quarter-units of land identified therein, including the Tract. The identification of the 1974 Lease between the Adams Family and Chesapeake shows that these quarter-units of land are subject to the terms of that lease (i.e. depth restrictions, other conditions on use of land, etc.). The identification of wells on those quarter-units of land shows what working interest the parties retained with respect to those wells, since as the listing for Argee Well 1-155 shows, the working interest lessee Chesapeake retained in wells located on the land it leased from the Adams Family was occasionally less than 100 percent. Assuming the language at the beginning of Exhibit A is not merely boilerplate as Oz contends, the Introductory Proviso serves to clarify that (1) the working interest in operative wells is "limited in area to . . . proration units surrounding the oil and/or gas wells referenced below . . .," and (2) the overall interest in both the quarter-unit tracts and the wells being conveyed in Parcel 3 is no larger than the original interest conveyed in the original 1974 Lease (i.e., that they "are subject to the depth restrictions and the other provisions of these leases").

This reading renders all the language in the granting clauses of the Exhibit A meaningful and internally consistent without having to resort to the use of extrinsic evidence to divine the deed's meaning. We are particularly convinced that this reading is correct given that the Trustee's Deed purports to convey "*all* of the property" listed in Exhibit A. [Empahsis added]. The Trustee's Deed conveyed Chesapeake's 75 percent interest in the Argee 1-155 well to Oz at foreclosure. The Trustee's Deed also conveyed any other remaining leasehold interests on the SE/4 of Sec. 155 to Oz as well. Since this is the only reasonable reading of the conveyances after construing the Trustee's Deed as a whole, giving effect to all its provisions, and applying

the relevant canons of construction, we find the Trustee's Deed is unambiguous.[10] Oz has title as a matter of law, and Appellants' summary judgment claims and verdict challenges on title are without merit.

However, we cannot end our analysis there. The trial court held that Oz had a 100 percent interest in the West Unit. We note a further complication. The Trustee's Deed states that Chesapeake only had a 75 percent interest in the Argee 1-155 well on the East Unit it could convey to Oz, and Exhibit A's Introductory Proviso establishes that well leases are limited in acreage to their proration units. Therefore, we must determine the size of the Argee 1-155 proration unit in relation to the SE/4 of Sec. 155. If the Argee 1-155's proration unit is coextant with SE/4 of Sec. 155, then Oz as the grantee would only have a 75 percent interest in the wells in question on the West Unit, and the trial court's judgment would be subject to reformation. *See Tex. Workers' Comp. Comm'n*, 136 S.W.3d at 648 (where both sides move for summary judgment and trial court grants one motion over the other, appellate court should render judgment trial court should have rendered). If the Argee 1-155 well's proration unit is limited solely to the East Unit, then Oz has a 75 percent interest in the East Unit acreage and a 100 percent interest in the West Unit acreage by virtue of the overriding land grant in the deed. Resolution of this issue is necessary to determine the issue of damages raised by Appellants.

Here, it is clear that the proration unit around the Argee well is limited to the 80 acres on the East Unit claimed in the Railroad Commission records.[11] The residual portion of the Tract,

---

[10] An ambiguity finding opening the door to consideration of extrinsic evidence would only go to bolster Oz's claim. Although there are letters in the record indicating that some of Oz's corporate officers did not believe the company owned the West Unit, the Settlement Agreement – which was not incorporated into the Trustee's Deed by reference – makes it clear that the parties intended to dispose of *all* the acreage and leases subject to the deed of trust, including the entirety of the SE/4 of Sec. 155, save for certain tracts not relevant to this appeal.

[11] As we noted previously, both parties argued extensively in their briefs over whether consultation with parol evidence is proper where a deed is unambiguous after being viewed through the appropriate canons of construction. However, our use of Texas Railroad Commission public records to determine this issue does not constitute the use

i.e. the West Unit, falls 100 percent to Oz by virtue of the grant in the Trustee's Deed as a matter of law. Because we find that the trial court correctly determined that Oz had title to 100 percent of the West Unit by virtue of the Trustee's Deed, determining what interest Oz gained in the West Unit from the Revivor Agreement is unnecessary to the resolution of this appeal. Such a Revivor Agreement is a top lease whose existence is only triggered by the failure of the underlying original lease. *See Shown v. Getty Oil Co.*, 645 S.W.2d 555, 561 (Tex.App.--San Antonio 1982, writ ref'd). Since the original lease is still in effect by virtue of continued production, and since neither side contends otherwise, construction of the Revivor Agreement would be advisory. As such, we decline to address subpart (b) of Issue Four. TEX.R.APP.P. 47.1.

## B. MINERAL TRESPASS

Having established that the trial court did not err in finding that Oz had exclusive title to the West Unit, we next turn to the issue of whether Oz provided sufficient evidence proving that Appellants committed a mineral trespass on land to which they lacked title. We find sufficient evidence to support the trial court's findings.

### *Fatal Pleading Variance as to Victory*

As a threshold matter, Appellant Victory contends a fatal variance between Oz's pleadings and the judgment the trial court rendered requires us to reverse the trial court's ruling that Victory was a bad faith trespasser. Specifically, Victory argues that although Oz sought a judgment of superior title against Victory, Oz never alleged a cause of action for trespass that would authorize the court's bad faith trespass judgment against Victory. We disagree.

"The judgment of the court shall conform to the pleadings . . . ." TEX.R.CIV.P. 301. "[A]

or parol evidence *per se*. Instead, the Trustee's Deed contains a nucleus of description referencing other writings – i.e., the Railroad Commission records establishing how large a proration unit for a given well is. As such, the public records have been essentially incorporated into the four corners of the document by reference.

finding made without supporting pleading will not sustain a judgment." *Bray v. Bray*, 1 S.W.2d 525, 525 (Tex.Civ.App.--Galveston 1927, no writ). "Customarily, a general prayer for relief will support any relief raised by the evidence that is consistent with the allegations and causes of action stated in the petition." *Nelson v. Najm*, 127 S.W.3d 170, 177 (Tex.App.--Houston [1st Dist.] 2003, pet. denied). "However, a prayer for 'other and further relief to which the plaintiff may be entitled at law or in equity' cannot enlarge the recovery to embrace a cause of action not within the pleadings." 47 TEX.JUR.3D *Judgments* § 92 (2014); *see also Starr v. Ferguson*, 140 Tex. 80, 86, 166 S.W.2d 130, 133 (Tex.Com.App. 1942)("The prayer for general relief cannot be construed as being a prayer for anything which is expressly excepted therefrom by other portions of the pleading.")[Internal quotation marks omitted].

The pleading excerpts relevant to this issue are as follows:

> 21. Intervenor Victory acquired its interests in the Disputed Tract after the Remuda Wells were drilled . . . .
>
> . . .
>
> CAUSES OF ACTION
>
> *Count 1 – Action in Trepass to try title*
>
> . . .
>
> 25. Despite Oz Gas's entitlement to possession of the premises, the defendants (excluding the Intervenor) unlawfully entered upon the premises for the purposes of oil and gas exploration, and dispossessed Oz Gas of the premises. *All defendants continue to dispossess Oz Gas from the premises while hydrocarbons are being produced.* [Emphasis added]
>
> 26. Oz Gas demanded that the defendants evacuate the premises and compensate Oz Gas for the value of all production severed and sold from the premises, but the defendants have failed and refuse to do so.
>
> 27. Accordingly, Oz Gas seeks judgment for the title and possession of

> the premises, for its damages, for costs of suit, and for such other relief as he may be entitled to either at law or in equity.
>
> *Count 2 – Mineral Trespass by defendants other than victory*
>
> 28. The defendants—other than Victory—instituted a direct and intentional physical trespass into plaintiff's mineral interests, without color of title. As a direct and proximate result of the defendants' trespass, the plaintiff has been damaged in an amount within the jurisdictional limits of this court.

Based on our reading of the pleadings, Victory's point that it was excluded from Oz's pleaded cause of action in Count Two for mineral trespass appears to be correct. However, Victory *was* included in the trespass to try title cause of action in Count One. While the first sentence of Paragraph 25 makes clear that Oz is alleging that all the defendants excluding Victory conspired to enter into the West Unit and actually did so, the second sentence of Paragraph 25 makes clear that *all* defendants, whether they participated in the initial trespass or not, are liable for continuing mineral trespass on the West Unit by producing hydrocarbons. Paragraph 27 further makes clear that based on this continuing mineral trespass, Oz seeks any and all relief to which it may be entitled.

"The plaintiff in a trespass to try title suit, by pleading facts showing it is entitled, may recover rents and profits or damages incurred from loss of use." *United Sav. Ass'n of Tex. v. Villanueva*, 878 S.W.2d 619, 623 (Tex.App.--Corpus Christi 1994, no writ)(citing TEX.R.CIV.P. 783(f)). Even assuming *arguendo* that pleading a trespass to try title claim would not authorize damages for continuing mineral trespass, in reading the pleadings as a whole, it is clear that Oz complained about Victory dispossessing it of its mineral interests, and sought damages for it. Because Oz pleaded sufficient facts, the trial court could properly find that Victory was a trespasser in bad faith and assess damages accordingly without varying fatally from the pleadings. Victory's sub-argument on fatal pleading variance.

### ***Sufficiency of Proof of Trespass***

All three Appellants maintain in part of Issue Three and the entirety of Issue Seven that even if we find Oz had actual title to the West Unit, there is no legally or factually sufficient proof that Appellants actually trespassed on the land. Appellants HCP and SmartGas argue that there is no proof they ever actually entered the property or directed Remuda to begin drilling the property, meaning that they could not have trespassed. Appellant Victory urges us to find that it could not have trespassed because it only "purchased" the West Unit *after* Remuda had already finished drilling operations. We disagree.

"[L]iability for trespass is not dependent upon personal participation . . . ." *Parker v. Kangerga*, 482 S.W.2d 43, 47 (Tex.Civ.App.--Tyler 1972, writ ref'd n.r.e.). "[O]ne who aids, assists, advises or gives encouragement to the actual trespasser, or concert and cooperation in the commission of a trespass, or subsequent ratification or adoption by one of an act of another for his benefit or in his interest is equally liable . . . ." *Id.* Here, although the specifics of who hired Remuda and how the arrangement worked in actuality are unclear, all parties admit that they had interests in the wells Remuda drilled, with HCP and SmartGas purchasing the lease to their wells prior to completion, which makes them parties to the trespass by clear implication. The fact that no Appellant appears to have received actual payments from oil production is irrelevant. *Cf. Meyers v. Ford Motor Credit Co.*, 619 S.W.2d 572, 573 (Tex.Civ.App.--Houston [14th Dist.] 1981, no writ), *abrogated on other grounds by Qantel Business Systems, Inc. v. Custom Controls Co.*, 761 S.W.2d 302 (Tex. 1988)("a trespasser is liable to the property owner even though there is no proof of actual damages in any specific amount."). Further, Victory's assertion that it only acquired land after Remuda had drilled the wells is irrelevant. By purchasing the lease after Remuda committed a trespass, Victory essentially ratified the trespass and positioned itself to

gain materially from that trespass. *Parker*, 482 S.W.2d at 47. As such, there is legally and factually sufficient evidence that all Appellants committed trespass on Oz's land by participating in the Adams 155-2 and Adams 155-3 drilling ventures.

Because the Trustee's Deed establishes that Oz holds title to the lease on the West Unit of the Tract as a matter of law, and because the evidence supports the trial court's finding that Appellants committed trespass as parties to the unauthorized drilling venture on the West Unit, we overrule Issues One, Two, Three, Six, and Seven.

## II.

## BAD FAITH AND DAMAGES

In Issues Four and Eight, Appellants contend that there is no legally and factually sufficient evidence supporting the trial court's finding of bad faith, and that such a finding is erroneous as a matter of law. In Issue Nine, Appellants argue that the trial court's conclusion that Oz is entitled to all working interest revenue from Adams 155-2 and Adams 155-3 is erroneous as a matter of law. In Issue Five, Appellants challenge the trial court's finding that Remuda actually paid any of them $137,897.13 from the working interest of Adams 155-2 and Adams 155-3 for legal and factual sufficiency. Finally, in Issue Ten, Appellants maintain that the trial court's order holding them jointly and severally liable for $137,897.13 was error, since there was no legally or factually sufficient evidence that Victory or HCP received any payments from SmartGas' well (Adams 155-2) or vice versa. Because a finding of bad faith bears directly on the scope of damages, we address these issues jointly.

### A. BAD FAITH TRESPASS

#### *Standard of Review and Applicable Law*

As we previously stated, we sustain a legal sufficient point when, in viewing the evidence

in the light most favorable to the verdict, there is no evidence, more than a scintilla, establishing proof of a vital fact. *City of Keller*, 168 S.W.3d at 810. We sustain an appellant's factual sufficiency point when the trial court's ruling is against the great weight and preponderance of the evidence. *Carmona*, 160 S.W.3d at 274. "When a producer trespasses and extracts oil, gas, or other minerals, the method by which damages are calculated depends on whether the producer's actions are in good faith." *Moore v. Jet Stream Inv., Ltd.*, 261 S.W.3d 412, 428 (Tex.App.--Texarkana 2008, pet. denied). A good faith trespasser with "an honest and a reasonable belief in the superiority" of his own title is liable for value of minerals extracted minus drilling and operating costs. *Id*. A bad faith trespasser is liable for the value of extracted minerals "at the time of severance without making deduction for the cost of labor and other expenses incurred in committing the wrongful act" or for any other value added. *Id*. at 428-29.

***Quasi-Estoppel***

As a preliminary matter, Appellants assert that Oz should be quasi-estopped from seeking damages for bad faith trespass under *Moore*, 261 S.W.3d at 429, because Oz agreed to have Remuda pay drilling proceeds into the Crockett County court registry during the pendency of litigation. By presenting an agreed order, Appellants contend that Oz essentially ratified Remuda's conduct, precluding it from taking the position that Remuda—and by extension Appellants—drilled in bad faith.

"Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id*.

In *Moore*, the appellee--plaintiff in the trial proceeding--filed a petition for a temporary restraining order that would prevent the trespasser from stopping production on a drilled well. Eventually, the plaintiff agreed to a temporary injunction in which production would continue. The Texarkana Court held that the landowner was quasi-estopped from seeking bad faith damages against the driller because the landowner's bad faith argument contradicted (1) his TRO request for production to continue, and (2) his agreement to a temporary order ensuring production continued. *Moore*, 261 S.W.3d at 429-30.

*Moore* leaves it unclear whether the funds went to the plaintiff or into receivership pending the outcome of litigation. To the extent *Moore* holds that a landowner is quasi-estopped from claiming bad faith trespass where funds the well produces are placed into receivership with the trial court, we respectfully disagree with our sister court. Oz has not "accepted a benefit" as the result of the agreed order. Instead, the parties agreed to place proceeds into the hands of a neutral third party – the trial court – pending the outcome of litigation. Any interest Oz has in those funds is entirely contingent on it prevailing at trial. Further, unlike in *Moore*, where the plaintiff specifically sought to compel the driller to continue production, Oz initially objected to having Remuda continuing operations and originally sought to have Adams 155-2 and Adams 155-3 shut in. We find nothing unconscionable about such an arrangement, nor is there any direct, non-contingent benefit being conferred on Oz. As such, quasi-estoppel does not preclude Oz from seeking bad faith damages against Appellants.

***Legal and Factual Sufficiency of Bad Faith Finding***

Finally, turning to the merits on this point, Appellants assert that the evidence is legally and factually insufficient to uphold the trial court's finding of bad faith. We disagree.

In its third conclusion of law, the trial court held that Appellants were bad faith

trespassers because "the defendants relied upon a twenty-year old title opinion that showed title to the SE/4 of § 155 in a different company than the company from whom they were acquiring an interest . . . ." The trial court also stated that it considered Appellants' failure to investigate title by commissioning a title opinion or researching the records themselves to be evidence of bad faith. We agree with the trial court's reasoning and its ultimate legal conclusion, whether viewing the evidence underpinning it from a legal or factual sufficiency standpoint.

Oz Gas presented evidence from attorney Allen Cumming, who testified that it is standard practice in the oil and gas industry to perform title research before entering into a particular transaction. All Appellants admitted that they failed to perform even a cursory check of title. Although Appellants attempt to portray Callis, the manager of HCP and SmartGas, as an unsophisticated investor, Callis admitted to having participated in prior non-mineral real estate transactions before in which he had sought title information. Secretary of State records confirm that Adams Fee Properties, Inc., the entity purported to convey the lease, had been defunct for years before this transaction even took place. Further, the stale title opinion Appellants relied upon in entering the transaction was more than two decades old, and even then, it listed Chesapeake and not Adams Fee Properties, Inc., as the holder of the lease in question. Taking all these factors in the aggregate, we find that the trial court justifiably found that Appellants did not have an honest and reasonable belief in the superiority of their title. Oz presented more than a scintilla of evidence supporting the trial court's finding, and such a ruling did not go against the great weight and preponderance of the evidence.

Issues Four and Eight are overruled.

### B. CALCULATING DAMAGES

Appellants present three general complaints pertinent to damages in the body of their

brief. We note these complaints do not necessarily neatly track the issues presented. First, Appellants maintain that we must reverse and remand because they were precluded from putting on evidence of good faith damages to deduct from any assessed trespasser liability. Specifically, the trial court blocked Appellants from putting on production and drilling cost testimony from Kenneth Hill, Victory's CEO, when it sustained Oz's objections to untimely disclosure of the witness and failure to provide access to voluminous records underpinning a summary report Hill had prepared for trial. This issue is now moot, since we affirmed the trial court's bad faith finding, which precludes Appellants from deducting production and drilling costs from any liability. To the extent any of Appellants issues hinge on that point, we overrule them. We address the remaining arguments in turn.

***Fact Finding on Remuda's Payments to Appellants***

In its second damages argument in Issue Five, Appellants assert that the trial court's finding of fact that they were actually paid must be reversed, since there is no legally or factually sufficient evidence to support it. Oz responds that the issue is irrelevant to this appeal, given that Appellants are liable to Oz for bad faith trespass damages regardless of whether Remuda paid them or not. We agree that the record does not appear to contain evidence affirmatively demonstrating that Remuda ever paid HCP or Victory, although Callis testified that SmartGas had received one payment. However, since the issue of liability does not hinge on whether Remuda actually paid the Appellants, *cf. Parker*, 482 S.W.2d at 47 (liability adheres where there is ratification of another's party's trespass), we decline to reach this issue under TEX.R.APP.P. 47.1.

***Joint and Several Liability***

Finally, Appellants argue that the trial court erred by failing to segregate the damages and

allocate them by well with respect to the parties, since there was no legally or factually sufficient evidence to show that HCP and Victory trespassed with respect to the 155-3 Well or that SmartGas trespassed upon the 155-2 Well.

In support of their argument, Appellants cite one Texas Supreme Court case from 1883, *Walker v. Read*, 59 Tex. 187, 191, 1883 WL 9129 (Tex. 1883). That case generally discusses joint and several liability, stating that a defendant who is sued along with others for a tract of land who "put[s] in a defense restricted to so much of the land as he does assert title to" to believe "relieve[d] . . . from liability for rent of or damage to any part of the land to which he did not assert claim to . . . ." *Id.* at *3. However, that case also appears to belie their point in that when a defendant:

> [R]esorts to obstructive measures in which he can have no possible interest, and which have the necessary effect of enabling other defendants in the same cause to withhold from the real owner property to which the real owner is entitled, then in morals and in law such person ought to be held, in so far, as much a wrong-doer as the person who receives the benefit of his act, and the two should be held jointly and severally liable for the necessary result of their acts. *Id.* at *4.

Later, in 1884, we are instructed that "all who aid or abet the commission of a trespass are liable jointly or severally . . . ." *Cunningham v. Coyle*, 2 Wilson 371, 1884 WL 8399, *1 (Tex.Ct.App. 1884). The imposition of joint and several liability turns upon the actions of the joint-trespassers as parties to the trespass. Thus, the legal or factual insufficiency of the evidence showing whether appellants actually trespassed as to both wells or benefitted is not directly relevant to the issue of whether the damages may be assessed jointly and severally given that personal participation is not required. *Parker*, 482 S.W.2d at 47; *Oxford v. Williams Companies, Inc.*, 137 F.Supp.2d 756 (E.D.Tex. 2001).

Oz counters that appellants failed to object to the trial court's imposition of joint and

several liability as to the damages. Therefore, error was not preserved and is waived. TEX. R. APP. P. 33.1. The record reveals Appellants did not object either to the judgment which held appellants jointly and severally liable nor was it raised in their motion for new trial. In fact, Appellants acknowledge this issue was never raised in the trial court. Their position is that in a non-jury case, such as this, they were not required to raise legal or factual sufficiency points for error preservation. TEX. R. APP. P. 33.1(d).

We find Appellants' have waived error given that their sufficiency point is immaterial to the imposition of joint and several liability under the facts of this case.

Issues Five, Nine, and Ten are overruled. The judgment of the trial court is affirmed.

September 17, 2014

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J. (Not Participating)