# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00282-CV

---

**New Braunfels Stewardship Properties, LLC and Harold T. Ray, III, Appellants**

**v.**

**Circle F Investments, LP and Original DFI, LLC, Appellees**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. C2021-0208D, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This case involves a commercial lease of real property. Appellees Circle F Investments, LP (Circle) and Original DFI, LLC (Original) leased commercial property from appellants, New Braunfels Stewardship Properties (NBSP) and Harold T. "Rusty" Ray, III (collectively "the NBSP Parties"). Circle and Original sued the NBSP Parties for breach of contract, fraud,[1] and unjust enrichment. The jury found in favor of Circle and Original and awarded them damages for their breach of contract and unjust-enrichment claims. The jury also awarded Circle damages for its fraud claims. The NBSP Parties raise eleven issues on appeal.[2]

---

[1] Both Circle and Original pleaded fraud claims, but only Circle's fraud claims were submitted to the jury.

[2] We will first address the issues that would give greater relief. *See In re M.H.*, 319 S.W.3d 137, 143 (Tex. App.—Waco 2010, no pet.) ("Generally, when a party presents multiple issues, an appellate court should first address the issue(s) that would afford the party the greatest relief.") (citing *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam)).

As described below, we will: reverse the portions of the trial court's judgment awarding (1) lost-profits damages for Circle's breach of contract claim, (2) damages for Circle and Original's unjust-enrichment claim, and (3) damages for Circle's fraud claims. We will render take-nothing judgments on (1) Circle's breach-of-contract and fraud claims and (2) Circle and Original's unjust-enrichment claims. We will also conditionally reverse and remand for a new trial on Original's breach-of-contract claim and related attorney's fees claims unless Original chooses to file a remittitur in the suggested amount and manner described below. If Original chooses to file the remittitur we will instead reform the trial court's judgment regarding the award of lost-profits damages to Original and affirm as modified.

## BACKGROUND

Circle and Original are both operated by Derrick Flack. Circle and Original were commercial tenants in a property owned by NBSP. Ray was an owner of NBSP along with co-owner, Joe Hickman. According to Flack, in 2017 he wanted to move his furniture store from San Marcos to New Braunfels and entered into a business arrangement with both Hickman, who was his accountant at that time, and Ray through their business NBSP. NBSP owned a shopping center in New Braunfels that needed renovations.

The parties signed commercial leases in October 2017. The leased property included a front building and a back building. Original leased the front building with the intent to sublease it to other businesses. Circle leased the back building with the intent to run a furniture-store showroom out of it. The parties agree that under the leases rent was set lower than market value because Circle and Original were going to renovate and improve the buildings

2

during the lease period. However, a disagreement about rent owed arose, and the parties executed amended leases in November 2018.

In February 2019, NBSP began the process of evicting Circle and Original. NBSP alleged that Circle had defaulted on its commercial lease agreement by failing to pay rent, which it argued was due January 1, 2019. NBSP alleged that Original had defaulted on its commercial lease agreement by "anticipatorily repudiating" the agreement. More specifically, NBSP alleged that the agreement provided that Original was obligated to begin paying rent upon the issuance of a valid permit for the property, but that Original had made statements to NBSP indicating Original was unable to complete the build-out necessary for Original to obtain the required permit without NBSP's agreement to cosign on Original's loan, which NBSP was unwilling to do. Circle and Original were evicted through a separate forcible detainer case. *See Circle F Invs., LP v. New Braunfels Stewardship Props., LLC*, No. 03-22-00696-CV, 2024 WL 4594124, at *1 (Tex. App.—Austin Oct. 29, 2024, no pet.) (mem. op.).

Circle and Original sued NBSP, alleging breach of contract and unjust enrichment. Circle also alleged fraud claims against NBSP and Ray, individually. The trial court granted partial summary judgment to Circle and Original on issues related to their breach-of-contract claims. After a jury trial, the jury awarded $2 million to Circle for lost profits from lost furniture sales for breach of contract, $2 million to Original for lost profits from lost subleases for breach of contract, and another $2 million to Circle and Original jointly for NBSP's unjust enrichment. The jury also awarded $1 million to Circle for its fraud claims. Circle was also awarded $1 in exemplary damages from NBSP and Ray, for $2 total. Circle and Original were also awarded $600,000 in attorney's fees and $80,000 in conditional appellate fees. The

3

trial court entered final judgment on the full amount awarded by the jury, plus post-judgment interest for all amounts awarded except attorney's fees. The NBSP Parties appealed.

## SUMMARY JUDGMENT

In two of their eleven issues on appeal, the NBSP Parties challenge the trial court's granting of two partial-summary-judgment motions—one in favor of Circle and one in favor of Original.[3]

### *Standard of review*

"We review summary judgments de novo, viewing the evidence in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal," Tex. R. Civ. P. 166a(c), and "[o]ur review is limited to consideration of the evidence presented to the trial court," *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 742 (Tex. App.—El Paso 2013, no pet.). When the trial court does not specify the grounds for granting the motion, we must uphold the judgment if any of the grounds asserted in the motion and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

A party moving for traditional summary judgment must demonstrate that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."

---

[3] Circle filed a traditional partial-summary-judgment motion and Original filed both no-evidence and traditional partial-summary-judgment motions.

4

Tex. R. Civ. P. 166a(c). A genuine issue of fact exists if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

A no-evidence motion for summary judgment is essentially a motion for pretrial directed verdict, requiring the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). A no-evidence motion is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

We review evidentiary rulings, including those connected to a summary-judgment motion, for an abuse of discretion. *See Starwood Mgmt. LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017) (per curiam). We do so by considering whether the trial court acted "without reference to any guiding rules and principles." *Id.* Even if evidence was erroneously excluded, we will not reverse unless appellants show that the error was harmful. *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); Tex. R. App. P. 44.1(a).

### *Summary judgment in favor of Circle (contract interpretation)*

In their eighth issue, the NBSP Parties contend that they are entitled to a new trial because the trial court erred by granting partial summary judgment in favor of Circle when a fact issue exists as to whether the parties agreed that Circle would start paying rent on January 1, 2019. The parties disagree on when Circle began owing rent according to the amended back-building lease. Circle filed a traditional motion for partial summary judgment requesting

5

that the trial court interpret the lease as a matter of law to obligate Circle to pay on "the Commencement Date"—Circle's interpretation of the lease—rather than on January 1, 2019, regardless of the Commencement Date—the NBSP Parties' interpretation. The trial court granted Circle's traditional motion for partial summary judgment and ordered that

> the Amended Back Building Lease shall be construed to: (1) automatically delay the Commencement Date of the Amended Back Building Lease until [Circle] had a reasonable opportunity to substantially complete construction to the leased premises such that it could occupy the space for the expressed use of the premises as noted in [paragraph] 9; and (2) obligate Circle F to pay rent to Defendant New Braunfels Stewardship Properties, LLC only after such reasonable Commencement Date.

The relevant contract provisions in the amended back-building lease between Circle and NBSP are:

3. **TERM:**

A. <u>Term</u>: The term of this lease is __60__ months and _____ days, commencing on:

__JANUARY 1, 2018__ (Commencement Date) and ending on

__DECEMBER 31, 2023__ (Expiration Date).

B. <u>Delay of Occupancy</u>: If Tenant is unable to occupy the leased premises on the Commencement Date because of construction on the leased premises to be completed by Tenant that is not substantially

(TAR-2101) 4-1-14    Initialed for Identification by Landlord: _____, and Tenant: _____, _____    Page 2 of 15
Genius Realty, 11207 Perrin Beitel #201, Joe D. Iley, San Antonio, TX 78217 | Phone: (210) 436-4877
Clint Chancellor

6

complete or a prior tenant's holding over of the leased premises, Landlord will not be liable to Tenant for such delay and this lease will remain enforceable. In the event of such a delay, the Commencement Date will automatically be extended to the date Tenant is able to occupy the Property and the Expiration Date will also be extended by a like number of days, so that the length of this lease remains unchanged. If Tenant is unable to occupy the leased premises after the 90th day after the Commencement Date because of construction on the leased premises to be completed by Tenant that is not substantially complete or a prior tenant's holding over of the leased premises, Tenant may terminate this lease by giving written notice to Landlord. Paragraph 3B does not apply to any delay in occupancy caused by cleaning or repairs.

C. Certificate of Occupancy: Unless the parties agree otherwise, Tenant is responsible for obtaining a certificate of occupancy for the leased premises if required by a governmental body.

## 4. RENT AND EXPENSES:

A. Base Monthly Rent: On or before the first day of each month during this lease, Tenant will pay Landlord base monthly rent as described on attached Exhibit_____or as follows:

| Dates | | Rate per rentable square foot (optional) | | Base Monthly Rent $ |
|---|---|---|---|---|
| From 9 | To 4 | $ Monthly Rate | $ Annual Rate | |
| JANUARY 1, 2018 | DEC 31, 2023 | .59/ rsf / month | 7.08/ rsf / year | 3500 |
| OPTION: | 2030 | ./ rsf / month | / rsf / year | |
| JANUARY1, 2024 | DEC 31, 2029 | .84/ rsf / month | 10.08/ rsf / year | 5000 |
| JANUARY 1, 2030 | DEC 31, 2035 | / rsf / month | / rsf / year | 75% OF MARKET |
| JANUARY 1, 2036 | DEC 31, 2041 | / rsf / month | / rsf / year | AVG ADV RATE |

B. Additional Rent: In addition to the base monthly rent, Tenant will pay Landlord all other amounts, as provided by the attached (Check all that apply.):
  ❑ (1) Commercial Lease Addendum for Expense Reimbursement (TAR-2103)
  ❑ (2) Commercial Lease Addendum for Percentage Rent (TAR-2106)
  ❑ (3) Commercial Lease Addendum for Parking (TAR-2107)
  ❑ (4) _____
  All amounts payable under the applicable addenda are deemed to be "rent" for the purposes of this lease.

C. First Full Month's Rent: The first full monthly rent is due on or before JANUARY 1, 2018

D. Prorated Rent: If the Commencement Date is on a day other than the first day of a month, Tenant will pay Landlord as prorated rent, an amount equal to the base monthly rent multiplied by the following fraction: the number of days from the Commencement Date to the first day of the following month divided by the number of days in the month in which this lease commences. The prorated rent is due on or before the Commencement Date.

. . . .

## 9. USE AND HOURS:

A. Tenant may use the leased premises for the following purpose and no other: The use of the premises shall be for retail sales, inventory storage and/or office use or professional and business use.

. . . .

## 34. SPECIAL PROVISIONS:

1. Tenant is leasing premises as is and is responsible for any and all improvements and changes.

. . . .

7

4. Landlord is not responsible for improvements and changes required under section 3.B. Any delays in construction completion are the responsibility of tenant.

. . . .

35. AGREEMENT OF PARTIES:

A. Entire Agreement: This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

Our primary objective in reviewing this issue is to ascertain the true intent of the parties as expressed in the lease. *National Union Fire Ins. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). If the terms used in the contract can be given a definite or certain legal meaning, the contract is unambiguous and will be enforced as written. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). In construing the lease's language, we must apply the ordinary and generally accepted meaning of the words used unless the contract indicates that the language used is intended to impart a technical or different meaning. *Id.* at 158. In addition, we must give effect to all provisions so that none are rendered meaningless. *Id.* at 157. "Surrounding circumstances may be considered—not to determine a party's subjective intent—but to determine the appropriate meaning to ascribe to the language chosen by the parties." *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394-95 (Tex. App.—Eastland 2007, no pet.).

The NBSP Parties contend that under the lease the Commencement Date and the first day on which rent was due are two different dates and that only the Commencement Date, and not the date rent was due, was extended by the occurrence of circumstances described in Section 3B. Circle argued to the trial court, and responds here, that both the original and

8

amended leases for the back building unambiguously establish that the Commencement Date and the date that rent was first due are the same date. Specifically, Circle argued that the lease provides that the "Commencement Date" would be automatically extended to the date that Circle's construction was substantially completed such that Circle could occupy the leased premises, and that Circle's rent obligation did not occur until the Commencement Date. Circle reasoned that Section 3A defines the lease term as the period between the "Commencement Date" and the "Expiration Date" and Section 4A provides that rent payments were due "during this lease." It further reasoned that Section 4C set the default start date for rent obligations and that Section 3B described the instances in which the lease term and connected rent obligation would be extended. Circle also argues that the necessity of Section 4D's text creating a provision for prorated rent to be "due on or before the Commencement Date," supports that the Commencement Date and rent-due date were the same day under this lease agreement and both were subject to extension. In other words, Circle reasons that the provision establishing that prorated rent was due on or before the Commencement Date and prorated to the end of that month was to provide for the circumstance where the Commencement Date had been extended due to one of the Section 3B circumstances and occurred on a date other than the first of the month—if the first rent payment was due on January 1, 2019, no matter what other events occurred, then the provision for prorated rent would be meaningless. *See American Mfrs. Mut. Ins.*, 124 S.W.3d at 157 (requiring courts to give effect to all provisions so that none are rendered meaningless).

Applying the ordinary and generally accepted meaning of the words used in the lease agreement and giving effect to all provisions so that none are rendered meaningless, we agree with Circle and the trial court that under this lease agreement both the start date for the rent

9

obligation and the start date for the lease commencement are the same. *See id.* at 157-58. As Circle pointed out, the lease states that its term begins on the Commencement Date and that rent is due monthly during the lease. Further, the paragraph contemplating rent being prorated for the month if the Commencement Date is on a day that is not the first of the month would be rendered meaningless if the date that rent was first due was unaffected by delays in the Commencement Date.

The NBSP Parties contend that the trial court erred when it excluded their summary-judgment evidence of a transcript excerpt of a tape-recorded conversation between the parties that they contend provides evidence of a collateral "Parking Lot Agreement." They characterize this evidence as establishing surrounding circumstances of the lease agreement and contend that it supports their interpretation of when rent payments were due under the lease. The excluded excerpt states:

DERRICK [FLACK]: Rent start date will be January.

JOE [HICKMAN]: Worst (sic) months' rent -- no – will be -- yeah, January 1, '19.

RUSTY [RAY]: Yep.

DERRICK: And that's -- yeah.

RUSTY: Yep.

DERRICK: Okay. So then we're going to keep -- so we're going to fix that date hard and fast.

RUSTY: Yes.

JOE: It's going to be -- (inaudible.)

DERRICK: January 1 is fixed hard and fast. Then if the parking lot comes up, y'all are just going to pay me on the side.

. . .

10

JOE: Bracket that thing and initial it, yeah.

DERRICK: You already bracketed it. The first full month January '19.

The parol-evidence rule "prohibits a party to an integrated written contract from presenting extrinsic evidence 'for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.'" *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) (cleaned up). However, "evidence of surrounding circumstances may aid the understanding of an unambiguous contract's language, inform the meaning of the language actually used, and provide context that elucidates the meaning of the words employed." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 749 (Tex. 2020) (cleaned up).

The NBSP Parties contend that the trial court should have considered the evidence of the "Parking Lot Agreement" because the contract is ambiguous. They argued to the trial court that sections 4A, 4D, and 3B conflict as to when rent was due, which they contend renders the lease agreement ambiguous because they cannot be harmonized. *See D Design Holdings, L.P. v. MMP Corp.*, 339 S.W.3d 195, 201 (Tex. App.—Dallas 2011, no pet.) (explaining that if reviewing court is "unable to harmonize the provisions and give effect to all of a contract's clauses, the contract is susceptible to more than one reasonable interpretation and is thus ambiguous"). Based on our above analysis harmonizing those three sections, we disagree.

The NBSP Parties argued that the lease's "as is" clause, which states "[t]enant is leasing premises as is and is responsible for any and all improvements and changes," creates ambiguity because it conflicts with the provision extending the lease Commencement Date due to tenant construction. We disagree that these provisions conflict. Rather, the provision extending the Commencement Date for tenant construction does not make anyone other than

11

tenant responsible for that construction. We conclude that the contract is not ambiguous. *See Am. Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 157 (explaining that "[w]hether a contract is ambiguous is itself a question of law").

The NBSP Parties also argued to the trial court that the excluded transcript was evidence of a collateral agreement that was made as the parties were signing the amended lease. Specifically, they argue that

> "[i]n exchange for Flack agreeing to start paying rent on January 1, 2019 regardless of whether Circle F was ready to open for business, NBSP agreed they would rebate the amount of Circle F's monthly ($3,500) rent plus $1,500 (for a total of $5,000) in the event Circle F's inability to obtain a Certificate of Occupancy was due to NBSP failing to have the parking lot ready in time, *i.e.* what has been called the Parking Lot Agreement."

On appeal, the NBSP Parties contend that this "Parking Lot Agreement" was a collateral agreement that provides the surrounding circumstances of the lease agreement and thus was not subject to exclusion under the parol-evidence rule and that the trial court should have considered the excluded evidence and should have denied Circle's summary-judgment motion.

The parol-evidence rule does not exclude "consistent collateral agreements." *Id.* (explaining that "the parol evidence rule 'does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof'" (quoting *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958))). Additionally, "[a] written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol-evidence rule." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,

352 S.W.3d 462, 469 (Tex. 2011). Thus, the parol-evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Id.* Surrounding circumstances that may be considered include the commercial setting that the contract negotiations were held in "and other objectively determinable factors that give a context to the transaction." *Id.* (considering surrounding circumstances in which insurance policy was negotiated such as fact that parties started with and edited form policy text and negotiated policy in London market).

Here, the purported collateral "Parking Lot Agreement" does not provide consistent surrounding circumstances or evidence of a consistent collateral agreement. Rather, the NBSP Parties offer it for the purpose of contradicting the plain meaning of the lease language and altering the parties' obligations under the lease. *See David J. Sacks, P.C.*, 266 S.W.3d at 451 (concluding that evidence offered that would alter parties' written fee agreement "not admissible under collateral and consistent exception to the parol evidence rule"). Additionally, the plain language of the lease provides that the written amended lease is the entire agreement and that the terms cannot be altered except in writing.

The NBSP Parties also contend that the excerpt is evidence of surrounding circumstances, which may be considered when interpreting an unambiguous contract. *See Piranha Partners*, 596 S.W.3d at 749. However, this contention fails for the same reasons that we concluded that the collateral agreements exception does not apply. Specifically, because although surrounding circumstances may be considered to aid our understanding, inform the meaning of the language used, and provide context to the words used, it cannot be relied on to "create ambiguity in the contract's text;" to "augment, alter, or contradict the terms of an unambiguous contract;" to "show that the parties probably meant, or could have meant,

13

something other than what their agreement stated;" or to "make the language say what it unambiguously does not say." *Id.* Here, the excerpt was not offered to inform the meaning of the lease's text but rather to add a contractual obligation or to change to the meaning of the text.

We cannot conclude that the trial court abused its discretion when it excluded evidence of an inconsistent collateral agreement that was not in writing under the parol-evidence rule. We also conclude that the trial court did not err when it granted Circle's partial-summary-judgment motion regarding the requested contract interpretation. Circle demonstrated that no genuine issue of material fact exists about whether the lease term and rental obligation began on the same date under the lease, and therefore, it was entitled to judgment on that issue as a matter of law. We overrule the NBSP Parties' eighth issue.

### *Summary judgment in favor of Original (repudiation)*

In their ninth issue, the NBSP Parties contend that they are entitled to a new trial because the trial court erred by granting a partial summary judgment in favor of Original when a fact issue exists as to whether Original repudiated its obligation to obtain a permit within a reasonable time. The NBSP Parties pleaded the affirmative defenses of "repudiation and anticipatory repudiation" in response to Original's breach-of-contract claim. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 139 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("Anticipatory repudiation is an affirmative defense to a breach of contract claim."). Original filed traditional and no-evidence partial-summary-judgment motions arguing that there was no evidence and no fact issues regarding whether it had repudiated the lease agreement. The trial court granted both motions and dismissed those affirmative defenses.

The parties agree that the amended front-building lease extended both the Commencement Date and the first date that rent was first due to six months after "date of permit." The parties also agree that no permit was ever acquired. The parties disagree regarding whether Original repudiated, or anticipatorily breached, the contract. The relevant sections of Original's lease agreement are:

2. **LEASED PREMISES:**

   A. Landlord leases to Tenant the following described real property, known as the "leased premises," along with all its improvements (*Check only one box*):

   ☐ (1) Multiple-Tenant Property: Suite or Unit Number three containing approximately 9,400 square feet of rentable area in NBSP LLC _____ (*project name*) at ▮ ▮
   (*address*) in NEW BRAUNFELS _____ (*city*), COMAL_____ (*county*), Texas, which is legally described on attached Exhibit_____ NA _____ or as follows:
   _____

. . . .

3. **TERM:**

   A. <u>Term</u>: The term of this lease is 60 _____ months and_____ days, commencing on: JULY 1, 2018 ~~ON 6MONTHS FROM DATE OF PERMIT TOE~~ (Commencement Date) and ending on _____ JUNE 30, 2023 ~~[handwriting] From~~ (Expiration Date). ~~[handwriting]~~

   B. <u>Delay of Occupancy</u>: If Tenant is unable to occupy the leased premises on the Commencement Date because of construction on the leased premises to be completed by Tenant that is not substantially

complete or a prior tenant's holding over of the leased premises, Landlord will not be liable to Tenant for such delay and this lease will remain enforceable. In the event of such a delay, the Commencement Date will automatically be extended to the date Tenant is able to occupy the Property and the Expiration Date will also be extended by a like number of days, so that the length of this lease remains unchanged. If Tenant is unable to occupy the leased premises after the 90th day after the Commencement Date because of construction on the leased premises to be completed by Tenant that is not substantially complete or a prior tenant's holding over of the leased premises, Tenant may terminate this lease by giving written notice to Landlord. Paragraph 3B does not apply to any delay in occupancy caused by cleaning or repairs.

C. Certificate of Occupancy: Unless the parties agree otherwise, Tenant is responsible for obtaining a certificate of occupancy for the leased premises if required by a governmental body.

4. **RENT AND EXPENSES:**

A. Base Monthly Rent: On or before the first day of each month during this lease, Tenant will pay Landlord base monthly rent as described on attached Exhibit _____ or as follows: _____

| Dates | | Rate per rentable square foot (optional) | | Base Monthly Rent $ |
|---|---|---|---|---|
| From | To | $ Monthly Rate | $ Annual Rate | |
| JULY 1, 2018 | JUNE 30, 2023 | ..82/ rsf / month | 9.84/ rsf / year | 7,666 |
| OPTION: | | ./ rsf / month | / rsf / year | |
| JULY 1, 2023 | JUNE 30, 2028 | 1.17/ rsf / month | 14.04/ rsf / year | 11,000 |
| JULY 1, 2028 | JUNE 30, 2033 | / rsf / month | / rsf / year | 75% OF MARKET |
| JULY 1, 2033 | DEC 31, 2038 | / rsf / month | / rsf / year | AVG ADV RATE |

B. Additional Rent: In addition to the base monthly rent, Tenant will pay Landlord all other amounts, as provided by the attached (Check all that apply.):
☐ (1) Commercial Lease Addendum for Expense Reimbursement (TAR-2103)
☐ (2) Commercial Lease Addendum for Percentage Rent (TAR-2106)
☐ (3) Commercial Lease Addendum for Parking (TAR-2107)
☐ (4) _____
All amounts payable under the applicable addenda are deemed to be "rent" for the purposes of this lease.

C. First Full Month's Rent: The first full monthly rent is due on or before JULY 1, 2018.

Here, the trial court granted both the no-evidence and traditional partial-summary-judgment motions filed by Original. We will review the trial court's grant of Original's motion for partial summary judgment under the no-evidence standard first. *See Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 170 (Tex. App.—El Paso 2014, pet. denied) ("[W]e first review the ruling under the more stringent no-evidence standard before analyzing proof under the traditional standard, if necessary." (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004))). Because the trial court did not specify the grounds for granting the motion, we must uphold the judgment if any ground asserted in the motion and preserved for appellate review is meritorious. *See Provident Life & Accident Ins.*, 128 S.W.3d at 216.

16

Repudiation, also called anticipatory breach, is an overt communication of intention or an action that either renders performance impossible or demonstrates an unequivocal intention not to perform in the future. *Scientific Mach. & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 462-64 (Tex. App.—Austin 2021, pet. denied). The elements of a common-law repudiation claim are: "(1) the allegedly repudiating party has absolutely refused to perform the contract according to its terms, (2) without just excuse for the nonperformance, and (3) damaged the nonrepudiating party." *Id.* at 462, n.7. Because the NBSP Parties asserted repudiation as an affirmative defense, they had the burden of proving the three elements. *See id.*

The NBSP Parties presented two theories for their repudiation affirmative defense. The first theory is that Flack had refused to ever get a permit in a reasonable time frame because he sent an email notifying NBSP that he could not get a permit without third party financing and that he required NBSP's financial assistance and NBSP had already declined to do so. We disagree with NBSP's interpretation of the relied-on emails.

In neither email does Flack unequivocally say that he will be unable to get the financing required to obtain the permit. *Van Polen v. Wisch*, 23 S.W.3d 510, 516 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (explaining that repudiation requires evidence of "a positive and unconditional refusal to perform the contract in the future"). Rather, in one of the emails, Flack explained in detail a potential option for financing that would include NBSP's involvement and his argument for why Ray and Hickman should change their previously expressed position on the topic. We understand the NBSP Parties' argument to be that Flack's attempting to negotiate a financing arrangement with them a second time after they had already declined is the equivalent of Flack's stating that NBSP was his only hope for financing and that if NBSP did not agree, he could not get the financing necessary to get the permit. According to

17

the NBSP Parties this was a repudiation because NBSP knew they would never agree. However, that interpretation is not supported by the summary-judgment record—even viewing the evidence in the light most favorable to the NBSP Parties as the non-movants. *See Zive*, 644 S.W.3d at 173. We disagree that attempting negotiations a second time on its own is the equivalent of unequivocally stating that a person has no other options to fulfill their contractual obligations. Because Flack's attempt to negotiate financing from NBSP is not evidence of unequivocal refusal to perform the lease, we hold that the NBSP Parties failed to raise a genuine issue of material fact on their first theory of repudiation.

The NBSP Parties' second theory of repudiation is that Flack repudiated his contractual obligation to obtain a permit within a reasonable time because a reasonable time to do so had already passed and he had not yet done so. *See Medical Imaging Sols. Grp., Inc. of Tex. v. Westlake Surgical, LP*, 554 S.W.3d 152, 158 (Tex. App.—San Antonio 2018, no pet.) ("A party may repudiate a contract either expressly or by a material breach" (citing *Hampton v. Minton*, 785 S.W.2d 854, 858 (Tex. App.—Austin 1990, writ denied))); *Scientific. Mach. & Welding, Inc.*, 641 S.W.3d at 464 (stating repudiation may occur through action that renders performance impossible). However, repudiation requires the repudiating party to be "without just excuse" for the nonperformance. *See Scientific Mach. & Welding, Inc.*, 641 S.W.3d at 462, n.7 (explaining that "without just excuse for the nonperformance" is one of three elements for repudiation cause of action). Original argued in its summary-judgment motion that the NBSP Parties' provided no evidence of Original's repudiation and noted correctly that repudiation requires the lack of a just excuse. For context, Original included its uncontroverted assertion that there was a holdover tenant—a daycare—in the vast majority of the leased premises during the relevant period and that Original was only able to use less than 2,000 square feet of the front

18

building compared to the over 9,000 square feet of the leased space. The NBSP Parties have consistently acknowledged the existence of the holdover tenant. The NBSP Parties did not provide any evidence to create a fact issue regarding Original's proffered excuse—i.e., that Original did not obtain a demolition or construction permit on a building that still contained a daycare when section 3B of the lease automatically extended the lease and rent term if Original was "unable to occupy the leased premises" due to "a prior tenant's holding over of the leased premises" and section 2A of the lease agreement defined the "leased premises" as 9,400 square feet of the front building.

Thus, the trial court did not err when it granted Original's no-evidence partial-summary-judgment motion on repudiation and anticipatory repudiation. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (explaining that no-evidence motion is properly granted if nonmovant fails to bring forth more than scintilla of probative evidence to raise genuine issue of material fact as to any essential element of nonmovant's claim on which nonmovant would have burden of proof at trial). Having determined the trial court did not err in granting Original's motion for partial summary judgment dismissing the NBSP Parties' affirmative defenses of repudiation and anticipatory repudiation, we overrule their ninth issue.

## SUFFICIENCY OF THE EVIDENCE

In their first and second issues, the NBSP Parties challenge the legal and factual sufficiency of the evidence to support the amount of lost-profits damages that the jury awarded to Original and Circle. In their third and fourth issues, the NBSP Parties challenge the legal sufficiency of the evidence to support the jury's verdict in Circle's favor on its fraud claims.

19

*Standard of review*

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding, appellate courts "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When, as here, the appellant challenges an issue on which it did not have the burden of proof at trial, it must demonstrate one of the following on appeal:

> (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.

*Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 916 (Tex. App.—Austin 2008, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

When an appellant challenges the factual insufficiency of the evidence to support a finding, appellate courts must consider all the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When, as here, a party challenges the factual sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, "we should set aside the verdict only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust." *Bechtel Corp.*, 271 S.W.3d at 916 (citing *Cain*, 709 S.W.2d at 176). We may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given

the testimony, and the resolution of evidentiary conflicts. *See City of Keller*, 168 S.W.3d at 819, 822. Because most credibility determinations in a jury's verdict are implicit rather than explicit, we "must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so." *Id.* at 819.

### Lost profits

"[L]ost profits can be recovered only when the amount is proved with reasonable certainty." *Phillips v. Carlton Energy Grp., LLC*, 475 S. W.3d 265, 278 (Tex. 2015). "When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Formosa Plastics Corp. USA v. Presidio Eng's & Contractors, Inc.*, 960 S.W.2d 41, 50 n.3 (Tex. 1998). The reasonable-certainty requirement is a flexible one, which is intended "to accommodate the myriad circumstances in which claims for lost profits arise." *Phillips*, 475 S. W.3d at 278. This means that the evidentiary "[p]roof need not be exact, but neither can it be speculative." *Id.* While what constitutes reasonably certain evidence of lost profits is a fact-intensive determination, the reasonable-certainty test for reviewing the sufficiency of the evidence for lost profits contains the minimum parameter that "opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* at 279.

Here, Original and Circle sought to prove their lost-profits damages by, among other things, offering expert testimony. "[E]xperts need not introduce foundational data supporting their conclusions unless the opposing party or trial court insists." *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 865 (Tex. 2017); *see also id.* (explaining that when demonstratives with witness's lost-profit calculations were not admitted into evidence, it

21

did not render evidence of lost profits insufficient when witness explained his opinions). However, a witness's lost-profits testimony must provide the jury with a basis for determining that the underlying assumptions that the calculations relied on are reasonable and reliable in order to be sufficient support for lost-profits damages. *See Phillips*, 475 S.W.3d at 281 (explaining that expert's calculation based on unsupported assumptions demonstrated that calculations were conjectural and did not provide reasonably certain proof); *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 626–27 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (concluding that evidence of lost profits was insufficient when expert witness assumed both that total sales made by competitor to former clients would have been made by plaintiff company and that plaintiff company's general profit margin would have applied to those former clients without introducing any evidence to support either assumption). Notably, "lost profits, by definition, must be profits—the net of income or revenues from a business activity less the expenses incurred in that activity." *Mid Continent Lift & Equip., LLC v. J. McNeill Pilot Car Serv.*, 537 S.W.3d 660, 665 (Tex. App.—Austin 2017, no pet.) (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992)).

The Texas Supreme Court has summarized cases in which the evidence of lost-profits damages was sufficient and insufficient and noted that "[t]he only common thread running through [those] cases is the necessity that the claim of lost profits not be hypothetical or hopeful but substantial in the circumstances." *Phillips*, 475 S.W.3d at 279. Also helpful is our sister court's comparison of cases in which appellate courts have concluded that the evidence of lost profits was insufficient versus those in which the evidence was held sufficient, leading our sister court to conclude that a lost-profits "model" is necessary for supporting an award of lost profits:

22

The common thread running through each of the cases we have summarized is that a party seeking to prove lost profits must provide a model showing how the amount of lost profits can be determined, support that model with facts and assumptions, and demonstrate how the assumptions in the model are reasonable. *Compare White* [*v. Sw. Bell Tel. Co., Inc.*], 651 S.W.2d [260,] 262–63 [(Tex. 1983)] (holding accountant's linear regression analysis along with proof of sales unaffected by error during same time period was sufficient to establish lost profits), *B & W Supply*[*, Inc. v. Beckman*], 305 S. W.3d [10,] 18 [(Tex. App.— Houston [1st Dist.] 2009, pet. denied)] (holding detailed evidence of costs and profits incurred before breach along with review of work remaining and projections of costs and payments remaining was sufficient), and *Barnett* [*v. Coppell N. Tex. Ct., Ltd.*], 123 S.W.3d [804,] 827–28 [(Tex. App.—Dallas 2003, pet. denied)] (holding testimony of previous profit growth, along with demonstrated familiarity with industry and growth of local area, was sufficient) with *Phillips*, 475 S.W.3d at 281 (holding merely laying out formula without supporting assumptions is insufficient), *Glattly*, 332 S.W.3d at 635 (holding unsupported assumptions of amount of sales and profit margin was insufficient) and *Examination Mgmt.* [*Servs., Inc. v. Kersh Risk Mgmt., Inc.*], 367 S.W.3d [835,] 841–43 [(Tex. App.—Dallas 2012, no pet.)] (holding testimony that two contracts were comparable and performance costs were very similar was insufficient without enumerating costs).

*Holmes v. Jetall Co.*, No. 01-15-00326-CV, 2016 WL 3662645, at *4 (Tex. App.—Houston [1st Dist.] July 7, 2016, pet. denied) (mem. op.).

### *Lost profits awarded to Original*

At trial, the district court submitted, and the jury awarded, "lost profits from subleasing the property that were a natural, probable, and foreseeable consequence of NBSP's failure to comply with the leases" in the "sum of money, if any, if paid now in cash, [that] would fairly and reasonably compensate Plaintiff Original DFI, LLC for its damages, if any, resulting from NBSP's failure to comply with the Amended Front Building Lease." The jury awarded Original $2 million in lost profits. The NBSP Parties contend that the evidence is insufficient to support the lost-profits-damages award because (1) the expenses calculation failed to adequately address the amount of rent that Original would have to pay NBSP throughout the lease term; (2)

23

Original's assumption of 100% occupancy from day one and continuously for 20 years is not supported by sufficient evidence; and (3) the expenses calculation regarding Original's expected operating costs fails to account for any additional operating cost that would occur after the initial remodel for the remaining 20 years of subleases, including "costs for marketing and leasing the property, contributing to tenant improvements, rent-free periods, repairs, maintenance, upgrades, or loan interest and other financing expense."

At trial, Original presented its lost-profits calculation through Flack, who testified to using a demonstrative spreadsheet not admitted into evidence. *See Horizon Health*, 520 S.W.3d at 865 (explaining that demonstratives with witness's lost-profit calculations not being admitted into evidence does not render evidence of lost profits insufficient on its own). Julie Willeke, a commercial real estate consultant and broker who worked in New Braunfels, testified regarding her knowledge of the commercial real-estate market and the services she provided to Flack, who had hired her to find tenants for his subleases. Flack's and Willeke's testimony provided support for the assumptions underlying Flack's lost-profits calculation.

Flack's formula for calculating Original's lost profits from the lost subleases resulting from NBSP's alleged breach of the front-building lease was to subtract the rent Original would owe to NBSP from the gross income Original would have received from its subtenants and then subtract the expected cost of renovating the front building.

The amended front-building lease set the annual amounts that would be owed to NBSP in rent each year: $7,666 per month for the first five years; $11,000 per month for years 6 through 10; and 75% of average market rate for years 11 through 20. Flack based his calculation for the rent amount Original would have received from the subleases on an unsigned sublease

24

and letters of interest from prospective subtenants with whom Willeke was in negotiations when NBSP evicted Original.

Multiple rounds of letters of interest and an unsigned lease demonstrated that Flack and Willeke had been negotiating terms of a fifteen-year sublease with Papa John's and that terms resulting from the negotiations were reflected in the unsigned lease. That unsigned lease set annual rent at $26 per square foot for the first year, provided for an annual increase of 2.5% for years 2-10, and provided that rent would be set at "the Prevailing Rate" for years 11 through 15. Flack multiplied the annual per-square-foot numbers from the Papa John's negotiations with the total square feet available for sublease—9,400—to calculate his gross sublease income.

The NBSP Parties contend that there was no evidence presented to support or explain how Flack determined what the market rate would be for years 11-20 to calculate how much he would have owed NBSP in future rent. Notably, rent for years 1 through 10 were based on numbers that came from the amended front-building lease to calculate Original's rent that would be owed to NBSP and from the unsigned Papa John's lease to calculate Original's projected gross sublease income. However, there was no testimony or other evidence admitted to provide the numbers that were used for years 11 and on. Nor did any witness or admitted exhibit explain what assumptions or methods were relied on in reaching the market-value calculation underlying years 11 through 20. For this reason, we agree with NBSP that the evidence is legally insufficient to support any amount of lost profits past year 10. There is no evidence of how the future market rates were calculated. To the extent the numbers were provided in the demonstrative shown to the jury but not admitted, there was no testimony to explain the assumptions relied on to reach those numbers. *See Holmes,* 2016 WL 3662645, at *4

25

(noting that "a party seeking to prove lost profits must provide a model showing how the amount of lost profits can be determined, support that model with facts and assumptions, and demonstrate how the assumptions in the model are reasonable"). Any amount awarded for those years would be too speculative. *See Phillips*, 475 S. W.3d at 279 (explaining that "profits not susceptible of being established by proof to that degree of certainty which the law demands cannot be recovered as damages" even when "the breach or tort may be clear" (cleaned up)).

However, because the fact of lost-profits damages can be supported by sufficient evidence but the evidence supporting the amount still be insufficient, *Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 149–50 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (remanding for new trial when record supported some but not all of jury's awarded damages amount), we continue our analysis by considering the sufficiency of the evidence to support the lost-profits calculation for years 1 through 10.

The NBSP Parties contend that Flack's underlying assumption that he would have 100% occupancy for the full lease term is not supported by sufficient evidence. Because we already determined the evidence insufficient to support years 11 through 20, we will only consider the sufficiency of the evidence to support the assumption of full occupancy for the first ten years. Flack testified that his lost-profits model included the assumption of 100% occupancy. Willeke testified that she had no doubt that she would have filled all the sublease spots. She explained the marketing package she had put together and the negotiations she was in the process of conducting with potential tenants including Papa John's, a dance studio, an Italian restaurant, and a private school. She explained how her approach focused on getting "anchor tenants," which are tenants that attract additional tenants; on bringing in national chains because they act as anchor tenants, are willing to pay more, and increase the value of the other units in shopping

26

centers; and on businesses that create foot traffic. Willeke testified that New Braunfels is "a tight market," which she explained meant that the demand for commercial real estate is higher than the supply.

Willeke provided details to support her opinions on the local commercial-real-estate market. Specifically, she explained: that the grocery-store chain HEB opening a location in town was attracting a lot of business to the area, including national chains; that Papa John's and Flack Furniture would act as "anchor tenants" and would create foot traffic, which would attract additional national chains as tenants; and that New Braunfels had been one of the top ten fastest growing cities in the country for the seven to eight years before trial. She also testified that the unsigned Papa John's lease was based on the market rate at the time it was drafted, that rates had increased since then, and that she did not expect commercial-real-estate prices to go down. Willeke also testified that having a national tenant like Papa John's would raise rent rates for the subsequent tenants. Additionally, Flack's wife, a residential-real-estate agent, testified that she kept up with commercial market trends as well as residential, and that she had expected Papa John's to be a tenant for twenty years because it was a national chain, and national chains like to stay in the same place for a long time.

We cannot conclude on this record that the evidence presented to support the assumption that the front building was going to have 100% occupancy would not "enable reasonable and fair-minded people to reach the verdict under review." *See City of Keller*, 168 S.W.3d at 827. We hold the evidence is legally sufficient to support the underlying assumption of 100% occupancy for ten years.

To support their sufficiency issue, the NBSP Parties highlight Ray's trial testimony that it took NBSP five years to finish the renovations and fully lease the front building.

27

We understand NBSP to be raising a factual-sufficiency challenge contending that that jury's implicit finding of 100% occupancy for the full lease term was not based on factually sufficient evidence because it took NBSP five years to reach that level of occupancy. However, Flack testified that his eviction from the NBSP property hurt his business reputation so strongly in the community that he could not open a new furniture store and had to switch industries to continue providing for his family. Specifically, Flack testified that he began driving an 18-wheeler and renting out dumpsters. Willeke testified in detail to how important having the Flack Furniture store in the back building was to her marketing plan for the front building subleases. Flack also testified that he had a team ready to start the renovations on the front building as soon as the holdover tenant was out, and permits were ready. He referred to these individuals as "[his] guys" and noted they had worked with him in the past. Flack also testified about his experience renovating the back building. The jury could have reasonably inferred that NBSP faced difficulties renovating and subleasing the front-building units that Flack would not have faced had he not been evicted. Considering all the evidence presented regarding expected front-building sublease occupancy rates, including Ray's testimony of NBSP's experience, we cannot conclude that the jury's implicit finding of 100% occupancy "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176.

The NBSP Parties contend that the evidence of the lost-profits damages is legally insufficient because Flack failed to include expenses in his damages model. Specifically, they contend that Flack failed to account for any overhead expenses other than the initial costs to renovate the front building. However, Flack testified regarding an additional $5 per-square-foot "common area maintenance" fee that would be paid by the subtenants. The letters of intent with

28

Papa John's included that common-area-maintenance number. And although the drafted lease with Papa John's did not include the maintenance fee, it did include a 15% management fee. Flack and Willeke testified that these fees were within industry standards. Neither the common-area-maintenance nor management fees were included in the income calculation. Although Flack's testimony was not as clear as it could have been on the issue of expense calculation, the jury could have reasonably inferred that the fees that would be paid by the subletters were going to cover Original's expected expenses of subleasing. *See Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389–90 (Tex. 2008) (explaining that fact that witness's "testimony could have been a lot clearer" does not in itself make it "unreliable or speculative" or "conclusory as a matter of law").

The NBSP Parties contend that Flack's model failed to account for repairs that were being negotiated by Papa John's. However, Flack testified that he had subtracted $425,000 from the profits to account for needed renovations to the front building. Flack explained that he reached that number by dividing the cost of repairing the back building and dividing by the renovated square feet to figure out how much it would cost per square foot to renovate the front building. He testified that he would have worked with the same contractors that he did for the back-building renovation and that "they already had cleared their schedules and were ready to go."

The NBSP Parties contend that Flack's model failed to account for "free-rent month" periods. Both Willeke and Flack testified that it is an industry standard to give a period of free rent to commercial lessees at the beginning of their rent term. Notably, Willeke testified, and the drafted Papa John's lease stipulated, that the first two five-year lease terms were arranged so that the first full five-year term did not start until month 4 of the lease and the second

29

five-year term did not start until month 64 (five years and 3 months later).  Thus, Flack's model did account for the free-rent months because they were front loaded and did not subtract from the ten years of payments with set amounts.

In summary, considering the applicable standards of review, we conclude that although the evidence supporting the lost-profits damages model for years 11 through 20 is too speculative to be sufficient, the evidence presented for the first ten years is legally and factually sufficient.  Using Flack's damages model described above, the evidence presented at trial is legally sufficient to support $1,193,147 in lost-profits damages for Original's lost front-building sublease income.[4]

---

[4]  These are the calculations, supported by trial testimony and admitted exhibits, used by the Court to calculate the lost-profits damages that are supported by sufficient evidence:

| Expected Gross Sublease Income for Years 1-10 | | | | | |
|---|---|---|---|---|---|
| year | sublease rent per sq. ft. | x | total sq. ft. | = | annual sublease income |
| 1 | $26 | x | 9,400 | = | $244,400 |
| 2 | $26.65 | x | 9,400 | = | $250,510 |
| 3 | $27.32 | x | 9,400 | = | $256,773 |
| 4 | $28.00 | x | 9,400 | = | $263,192 |
| 5 | $28.70 | x | 9,400 | = | $269,772 |
| 6 | $29.42 | x | 9,400 | = | $276,516 |
| 7 | $30.15 | x | 9,400 | = | $283,429 |
| 8 | $30.91 | x | 9,400 | = | $290,515 |
| 9 | $31.68 | x | 9,400 | = | $297,778 |
| 10 | $32.47 | x | 9,400 | = | $305,222 |
| | | | **total** | **=** | **$2,738,107** |

When "part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict." *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). Because we conclude that there is insufficient evidence to support the full amount of lost-profit damages awarded to Original but sufficient evidence to support a lesser award, we will suggest a remittitur of $806,853, which is the difference between the total amount of lost-profits damages awarded to Original, $2 million, minus the amount of damages supported by sufficient evidence, $1,193,147. *See* Tex. R. App. P. 46.3; *Bechtel Corp.*, 271 S.W.3d at 922; *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 889–90 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.). The prevailing party in the trial court, here Original, should be given the option of accepting the remittitur or having the case remanded for a new trial, *see Larson*, 730 S.W.2d at 641, on both liability and damages regarding lost profits from the front-building lease, *see Pointe W. Ctr.*, 476 S.W.3d at 149–50 ("When liability is contested, courts may not grant a new trial on unliquidated damages solely.

| Rent That Would Have Been Owed to NBSP for Years 1-10 | | | | | |
|---|---|---|---|---|---|
| | rent/mo. | x | 60 mos. | = | rent for 5 year period |
| years 1-5 | $7,666 | x | 60 | = | $459,960 |
| years 6-10 | $11,000 | x | 60 | = | $660,000 |
| | | | total | = | $1,119,960 |

| Front Building Lost Profits for Years 1-10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| gross sublease income | - | total rent owed | - | expected renovation cost | = | lost profits years 1-10 |
| $2,738,107 | - | $1,119,960 | - | $425,000 | = | $1,193,147 |

Tex. R. App. P. 44.1(b). Instead, we must remand for a new trial on both liability and damages."). Thus, we conditionally sustain NBSP's first issue, unless Original files a remittitur in the suggested amount of $806,853 in the district court within thirty days of the date of this opinion and notifies this Court of having so filed its remittitur.

### Lost profits awarded to Circle

At trial, the district court submitted, and the jury awarded "lost profits from furniture sales that were a natural, probable, and foreseeable consequence of NBSP's failure to comply with the leases," in the "sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff Circle F Investments, LP for its damages, if any, resulting from NBSP's failure to comply with the Amended Back Building Lease." Circle asked for $1.4 million in lost-profits damages for furniture sales. It also asked for lost profits from lost sublease profits for the back building. Flack testified that he planned to run his furniture store in the back building for five years and then downsize his furniture store showroom to half the building and sublease out the other half. The jury awarded Circle $2 million in lost profits for furniture sales and no damages for the subleases.

On appeal, the NBSP Parties contend that the evidence is insufficient to support the lost-profits damages award because (1) Circle's model improperly ignores both the cost of future rent and the cost of the build-out for the store; (2) the assumption that Circle's new store would have made the same profit "per square foot" for 20 years as Flack's furniture business had averaged in a 30-month period through two different stores is not supported by sufficient evidence; and, (3) alternatively, the jury's award of $2 million is not supported by the evidence

32

because Flack's damages model for the lost furniture sales calculated lost profits at only $1.4 million.

Regarding the lost profits for furniture sales, Flack testified that he used the industry-standard methodology of "profit per square foot." He explained that he has a business degree and worked in furniture sales for 30 years as an adult. He testified that running a furniture store was a family business that started with his mother and that he had experience with her stores and his own furniture businesses. Based on his industry knowledge, he used the tax returns for his furniture business for the years 2016, 2017, and 2018. He testified that by using the past three years' tax returns—before being evicted in 2019—to calculate the profit per square foot, he was following industry standards. His 2015 tax return was also admitted into evidence but was not included in his calculations. He explained that 2015 was not used in calculating the profit-per-square-foot figure because it was an "anomaly" year due to San Marcos being affected by two "historic floods." There was also testimony regarding a "carry forward loss" from a 2007 tornado that destroyed the store building that was reflected on the 2015 tax return.

The 2016 return reflected a full year of business from Flack's established San Marcos location, which resulted in a net profit of $112,436. In 2017 he sold that store, so that return only reflected half a year of furniture business, which resulted in a net profit of $42,309. The store in San Marcos was 6,000 square feet. Flack testified that in 2018, half of his furniture sales were from online sales and half were sales that had been made the previous year and were delivered, and recorded, in 2018. There was contrary evidence presented by Darlene Leckrone, an accountant at the same firm as Hickman, who testified that there were no deposits recorded on the 2017 return to explain the claimed carry-forward sales in 2018. Flack testified that the 2018 online sales were run out of a 5,000 square-foot warehouse on the same property as his

33

residence.  The reported 2018 net income for Flack's furniture business was $127,553.  The 2015 return showed a net profit of $25,742, which was not used in Flack's profits calculation.

Flack explained that he averaged the three years' profits to get $21.64 per square foot.  He then multiplied that number by the square feet he would run his furniture business in—all 6,000 square feet of the back building for the first five years and then reduced to 3,000 square feet during years 6 through 20.  He subtracted the rent he would pay NBSP for the first five years and arrived at the sum of $1.4 million in lost profits for furniture sales.  He testified that he accounted for the rent he would owe for years 6 through 20 in the calculation for his lost profits in subleasing half of the back building during years 6 through 20.  Leckrone testified that the calculations were "overstated," in part from failure to include industry-standard overhead costs.

Similarly to our previous lost-profits analysis regarding the front-building subleases, the amount of back-building rent to be paid to NBSP for years 11 through 20 was 75% of "market value."  However, no evidence was presented for how future market value was calculated or what assumptions or methods were relied on to calculate that figure.  Any amount awarded for years 11 through 20, which relies on the purely speculative future market value, is not supported by legally sufficient evidence.  Thus, we continue our analysis by considering the sufficiency of the evidence to support the furniture-sales lost-profits calculation for years 1 through 10.

The NBSP Parties contend that the assumptions on which Flack based his profit-per-square-foot calculation are unsubstantiated speculation.  Specifically, NBSP complains that Flack based the numbers on only two-and-a-half years of profits, which accounted for Flacks last year and a half of an established business that had been running for 20 years and a year of "online sales."  NBSP also complains that Flack did not include the furniture store's 2015 net

profit, "ignored the impact of Covid from 2020 to 2022," assumed profits would not change for the full period, and failed to adjust the numbers based on the circumstances for the new versus the old furniture store.

Flack explained that 50% of the 2018 furniture profits—the year he was operating online out of a warehouse instead of a shop front—were attributable to the previous year because furniture sales get recorded as income six months after the sale is made. However, he also testified that his store closed in the middle of 2017 and, thus, only reflected six months of sales. No testimony explained his assertion that half of 2018's profits would reflect 2017 sales due to a six-month lag of recording furniture sales when for the last six months of 2017 there was no store. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (noting that "[w]hen an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment"); *Gen. Growth Props., Inc. v. Property Tax Mgmt., Inc.*, 614 S.W.3d 386, 395 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (explaining that "[f]or an expert's testimony to be considered reliable, the expert 'must show the connection between the data relied on and the opinion offered'" (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004))).

There was no testimony regarding any adjustment to the net profits of 2018 to account for the fact that at least half of the income was being earned from a warehouse and online sales rather than a store front or how the overhead and employee costs compare between the two. There was also no testimony about any adjustment for the effects Covid on the furniture market for years 2020 to 2022 which were before trial took place and were included in the years he was seeking lost profits for. *See M & A Tech., Inc. v. iValue Grp., Inc.*, 295 S.W.3d 356, 366

35

(Tex. App.—El Paso 2009, pet. denied) ("Normally, when conducting a lost profit analysis you look to past profits and adjust these numbers based on the surrounding circumstances to determine what the lost profit for a certain time period should be").

Although Flack testified that he had been running the San Marcos furniture store under the brand "Diane Flack" for about ten years and as "Cowboy Style" for eleven years before that, he only used the past three years to calculate an average to cover the next twenty years. *See Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 448 (Tex. App.—Beaumont 2008, pet. denied) (rejecting lost-profits model that looked to "past performance only when it benefited" plaintiff and failed to consider overhead costs). We conclude that the assumption underlying Flack's damages model—that his new furniture business would make the average amount that his combined established business and online business did without adjusting for differences in overhead and market fluctuations—is too speculative to constitute evidence of lost profits. *See Holt Atherton Indus.*, 835 S.W.2d at 84 (stating that "[t]he amount of the loss must be shown by competent evidence with reasonable certainty").

We conclude that the evidence presented to support lost profits for the expected furniture sales from the back-building lease is speculative and unreliable and thus constitutes no evidence to support the jury's damage award. Because the evidence presented is legally insufficient to support the jury's award of lost profits for the furniture sales, we sustain NBSP's second issue, reverse that portion of the trial court's judgment, and render judgment that Circle take nothing on its breach-of-contract claim. *See id.* (partially reversing judgment awarding lost profits found to be legally insufficient and rendering take-nothing judgment on that issue).

36

*Fraud*

In their third and fourth issues, the NBSP Parties contend that there is no evidence to support Circle's fraud claims. In their eleventh issue, the NBSP Parties request that in the event we reverse the judgment on the fraud claims, we also reverse the judgment on the exemplary-damages awards that arose from the fraud claims.

At trial, the district court submitted to the jury the following question:

Did NBSP or Ray commit fraud against Plaintiff Circle F Investments, LP?

Fraud occurs when—

1. A party makes a material misrepresentation, and
2. The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
3. The misrepresentation is made with the intention that it should be acted on by the other party, and
4. The other party justifiably relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means:

1. A false statement of fact,
2. A promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or
3. A statement of opinion based on a false statement of fact.

The jury answered "yes" regarding both NBSP and Ray.

Although Circle pleaded in the trial court and briefed on appeal multiple types of fraud claims, it submitted to the jury only its common-law fraud claim against each defendant. Circle's theory presented at trial for its common-law fraud claim was that Circle relied on "the deal" it had with NBSP when it spent about $240,000 on the back building. Circle contends that "the deal" was that Circle and NBSP would enter into the back-building lease for below-market-

37

value rent from Circle in exchange for Flack renovating the back building. Circle contends that throughout the process of renovating the back building, NBSP made additional misrepresentations—that they would complete the parking lot by a certain date or compensate Circle monthly for delayed completion and that NBSP was "out of cash"—to induce him to continue and finish the renovations.

For clarity, we provide a timeline of the events relevant to our analysis of Circle's common-law fraud claim:

- Prior to October 18, 2017, the parties discuss "the deal," in which they will sign a long-term commercial lease at below-market rental rates with the expectation that Flack will renovate NBSP's buildings.

- On October 18, 2017, the parties signed the original back-building lease.

- As of early August 2018, Circle had spent "over $150,000" on the back-building renovation.

- On August 24, 2018, the parties had a meeting where they discussed the "Parking Lot Agreement," Ray told Flack that he needed thirty days to finish the parking lot, and Hickman told Flack that they would pay him $5,000 for each month that the parking lot was incomplete after thirty days.

- In November 2018 the parties signed the amended back-building lease.

- On December 28, 2018, Hickman told Flack that NBSP was "out of cash."

- On January 3, 2019, Flack emailed NBSP stating that he had completed his part of the inside of the back building but that the parking lot was not done yet.

- On January 4, 2019, Hickman repeats to Flack that NBSP was "out of cash."

- On January 26, 2019, the parking lot was completed.

- On January 30, 2019, the back building was inspected.

- In early February 2019, NBSP initiated the eviction process.[5]

One of Circle's asserted misrepresentations is that "the deal" between Circle and NBSP was a misrepresentation that the parties would agree to a lease for below-market-value rent in exchange for Circle's renovating the building first and that NBSP would prorate rent until construction was complete on the building and the parking lot. Circle also asserted that additional misrepresentations were made to keep it in "the deal": (1) Hickman's statements to Flack that NBSP was "out of cash" and (2) Ray's and Hickman's statements to Flack that the parking lot would be completed by the end of September 2018 or that Circle would receive $5,000 for each month after that. One of the definitions of "misrepresentation" submitted to the jury, and relevant here, was, "A promise of future performance made with an intent, at the time the promise was made, not to perform as promised."

"A promise to do an act (or refrain from an act) in the future constitutes fraud only when made with no intention of performing the promise at the time the promise was made." *Springs Window Fashions Div.*, 184 S.W.3d at 879–80. Either direct or circumstantial evidence may establish fraudulent intent. *Id.* at 880. Even "[s]light circumstantial evidence of fraud, when considered with a breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.* (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)).

However, failure to perform a promise is simply a factor that can be considered in determining fraudulent intent and is not on its own dispositive of intent at the time the promise was made. *Id.* To support fraudulent intent, the evidence must be more than merely evidence

---

[5] Although inconsistent evidence was presented regarding when Circle was provided with notice to vacate, the evidence supports that it was either on February 8th or 11th of 2019.

that the person did not perform as promised. *Formosa Plastics*, 960 S.W.2d 48 (explaining that "the mere failure to perform a contract is not evidence of fraud"); *compare id.* at 48-49 (concluding that evidence of intent to not perform as promised was sufficient when evidence showed that bid package and contract gave plaintiff control over concrete operations, but defendant gave itself control over operations in between representation made in bid package and both parties signing contract without informing plaintiff of operations change), *and In re Penafiel*, 633 S.W.3d 36, 47 (Tex. App.—Houston [14th Dist.] 2021, pet. denied) (concluding that evidence that husband had history of hiding community assets and making false statements regarding efforts to fulfill promises regarding assets was sufficient evidence to support that promise to turn over assets was made with intent to not perform as promised but rather "as part of a scheme to buy time to further hide and shield assets"), *with Petras v. Criswell*, 248 S.W.3d 471, 476 (Tex. App.—Dallas 2008, no pet.) (concluding that evidence showing that defendant failed to meet contractual deadlines and perform to expected standards combined with defendant's knowledge of negative consequences that his behavior would have on plaintiffs did not create fact issue on whether defendant never intended to perform as promised but rather was merely evidence of failure to perform).

Here, Circle presented no evidence that at the time NBSP agreed to "the deal," it intended not to perform as promised. "The deal" occurred prior to the original lease being signed, and there was no evidence presented of any alleged misrepresentations occurring until ten months after the original lease was signed. Viewing the evidence in the light most favorable to the verdict and indulging every reasonable inference in Circle's favor, we conclude that there is insufficient evidence to support the jury finding that "the deal" was a misrepresentation.

40

We next consider the sufficiency of the evidence to support the jury's finding of fraud regarding Circle's other two alleged misrepresentations. "To prevail on a fraud claim, a plaintiff is required to demonstrate that he relied upon a fraudulent misrepresentation to his detriment." *Gray v. Waste Res., Inc.*, 222 S.W.3d 522, 524–25 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930–31 (Tex. 1983)). Circle contends that Ray and Hickman made misrepresentations regarding the parking lot and that NBSP was "out of cash" to induce him to continue spending money on and completing the back-building renovation. Flack testified that he relied on the parking-lot promise by staying in the deal and continuing to fix up the building. However, Flack also testified that he had agreed to do the renovations as part of "the deal," that he was renovating the back building so that he could use it as a furniture-store showroom, and that he had already spent $150,000 but was only about halfway through the renovations as of early August. Thus, although Flack testified that he relied on the statements made in late August and December to complete the renovations, he also testified that he had long before agreed to complete the project and was significantly invested at that point. *Id.* (concluding there was no evidence of plaintiff's reliance on defendant's misrepresentations made to induce plaintiff to not buy shares when plaintiff testified that he would have bought shares but was unable to because he could not secure financing). Further, Circle did not present any evidence of when it spent the additional $90,000 on the back building. Notably, there is nothing in the record that demonstrates that any amount was spent after Ray's or Hickman's statements. Viewing the evidence in a light most favorable to the verdict and indulging every reasonable inference in Circle's favor, we conclude there is insufficient evidence to support the jury finding that Flack relied on either the "parking lot agreement" statements or the "out of cash" statement to his detriment. Because we have concluded that the evidence to

support Circle's fraud claims is legally insufficient, we sustain the NBSP Parties' third and fourth issues.

Since, here, "there was no evidence to support the fraud finding, as a matter of law there can be no evidence to support . . . the award of punitive damages." *Airborne Freight Corp. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 297 (Tex. App.—El Paso 1992, writ denied). Thus, we sustain the NBSP Parties' eleventh issue.

We reverse the trial court's judgment on Circle's fraud claims and connected exemplary damages and render judgment that Circle take nothing against NBSP and Ray for its fraud claims and request for exemplary damages. *See Nelson v. McCall Motors, Inc.*, 630 S.W.3d 141, 144 (Tex. App.—Eastland 2020, no pet.).

## UNJUST ENRICHMENT

In their fifth issue, the NBSP Parties contend that unjust enrichment was unavailable to Circle and Original because the leases cover the subject matter of the claim. At trial, Circle and Original argued to the jury that they were entitled to $241,891.22 for the amount they spent on fixing NBSP's back building under a theory of unjust enrichment. NBSP objected to submitting an unjust-enrichment instruction to the jury under the same ground it raises here—that unjust enrichment is unavailable to Circle and Original because the subject matter of the claim is the subject of a contract. The court submitted the following question to the jury, "Do you find that Defendant NBSP was unjustly enriched by way of the actions or services of Plaintiffs?" The charge explained, "Unjust enrichment occurs when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." The jury answered "yes." The jury awarded Circle and Original $2 million for their unjust-enrichment claim. On

appeal, Circle and Original contend that they are entitled to the awarded $2 million as disgorgement for the higher rents that NBSP can now charge as a benefit of the renovations completed by Circle and Original.

"Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). The NBSP Parties contend that whether the award was for the renovations made to the back building or for disgorgement of the profits received by NBSP as a result of evicting Circle and Original pursuant to the leases, both are covered by the subject matter of the contracts. They further reason that if NBSP received more profits from leasing the buildings than it should have under the leases with Original and Circle or if NBSP and not Circle now get to enjoy the benefit of Circle's improvements to the back building, even if due to a breach of contract, those are all subjects covered by the subject matter of the leases. We agree.

Regarding Circle and Original's disgorgement argument, the leases set out how much each of them would pay to NBSP for rent, the parameters for performance under the leases, and eviction procedures. Regarding the amount spent on the renovations, the leases provided that Circle and Original were accepting the buildings "as is" and were "responsible for any and all improvements and changes," and set an amount for "tenant improvement and changes" that NBSP would repay Circle and Original for renovations made to each building. The leases also specified that they "contain[] the entire agreement between Landlord and Tenant and may not be changed except by written agreement." Further, the fact that we have reversed and rendered a take-nothing judgment on Circle's breach-of-contract claim does not make unjust enrichment available to it for the amount it spent renovating the back building in reliance of the

43

benefit promised through the contract. *See id.* (concluding as matter of law that existence of contract covering subject matter of dispute foreclosed unjust-enrichment claims even when plaintiffs elected to pursue unjust enrichment rather than breach-of-contract claim).

We sustain the NBSP Parties' fifth issue, reverse the trial court's judgment regarding Circle and Original's unjust-enrichment claim, and render a take-nothing judgment on unjust enrichment.[6]

## ATTORNEY'S FEES

In their tenth issue, the NBSP Parties contend that "the award of attorney's fees should be reversed because the contract claim is being reversed or because a new trial is necessary." The parties agree that the only claims presented to the jury that could support the awarded attorney's fees are the breach-of-contract claims. Circle and Original respond that they are entitled to attorney's fees "based on the jury's finding NBSP breached the leases."

Here, the amended leases are controlling regarding Circle and Original's entitlements to attorney's fees. *See Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009) (explaining that "[p]arties are free to contract for a fee-recovery standard either looser or stricter" than statutory provisions and that when they do, that contract language controls). Here, the amended leases provided that: "Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in

---

[6] In their sixth issue, the NBSP Parties contend that the award of damages to Original for both breach of contract and unjust enrichment was a violation of the one-satisfaction rule. In their seventh issue, the NBSP Parties contend that the award of damages to Circle for breach of contract, fraud, and unjust enrichment must be reversed because it violates the one-satisfaction rule. Because we have reversed the portions of the judgment awarding damages to both Circle and Original for unjust-enrichment damages, and to Circle for its breach-of-contract damages and its fraud claims, we need not address the NBSP Parties' sixth or seventh issues. *See* Tex. R. App. P. 47.1.

this lease is entitled to recover prejudgment interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party." Because the contract does not define "prevailing party," we will presume the parties intended the term's ordinary meaning. *Id.* "Whether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable," and "a stand-alone finding on breach confers no benefit whatsoever." *Id.* at 655.

The jury was instructed to answer the charge question regarding attorney's fees if they found in favor of either Circle's or Original's breach-of-contract claims, and the amounts were not awarded separately for each of them. Regarding Circle's attorney's fees, because we have rendered a take-nothing judgment on its contract claim, it is not a "prevailing party" on that claim. *See Intercontinental Grp.*, 295 S.W.3d at 655 (concluding that party who received take-nothing judgment was not "prevailing party" under term's ordinary meaning). Regarding Original's contract claim, if it accepts our suggested remittitur, then it will still be a prevailing party on the contract claim and the jury's attorney's-fees award will be affirmed. If Original chooses instead to pursue a new trial on its contract claim, then "we must also remand its claim for attorneys' fees related to this claim." *Pointe W. Ctr.*, 476 S.W.3d at 153. Thus, we conditionally sustain NBSP's tenth issue.

## CONCLUSION

We reverse the portion of the trial court's judgment that awards lost-profits damages for Circle's breach-of-contract claim and render a take-nothing judgment on that claim. We also reverse the portion of the trial court's judgment regarding, and render take-nothing judgments on, Circle's fraud claims and requests for exemplary damages against NBSP and Ray.

45

We reverse regarding, and render take-nothing judgments on, the portions of the judgment awarding Circle and Original recovery on their unjust-enrichment claims.

We conditionally reverse and remand for new trial Original's breach-of-contract and related attorney's-fees claims, unless Original files a remittitur in the suggested amount of $806,853 in the district court within thirty days of the date of this opinion and so notifies this Court. If Original files the remittitur, we will reform the district court's judgment for Original's contract damages to award $1,193,147 for lost profits and affirm the judgment on Original's contract-claim damages as modified and affirm the related attorney's fees.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Reversed and Rendered in Part and Conditionally Reversed and Remanded in Part

Filed:   August 29, 2025